[No. C015978. Third Dist. June 26, 1995.]

JAMES R. SCHMIDT, Plaintiff and Appellant, v.
FOUNDATION HEALTH et al., Defendants and Respondents.

### COUNSEL

Perez & McNabb, Sandra J. McNabb, Richard L. Perez and Jeffrey Alan Miller for Plaintiff and Appellant.

Brobeck, Phleger & Harrison, Michael L. Spolan, Samuel J. Fleischmann, Kroloff, Belcher, Smart, Perry & Christopherson, Elizabeth Humphreys, Randy G. Lockwood, Taylor & Jenkins and William J. Taylor for Defendants and Respondents.

### OPINION

**SPARKS, J.**—In this appeal, we conclude that the Knox-Keene Health Care Service Plan Act of 1975 (Act) (Health & Saf. Code, § 1340 et seq.) and section 1300.46 of title 10 of the California Code of Regulations (hereafter regulation 1300.46) prohibit a broker of health care service plans from rebating commissions to his clients.

Plaintiff James R. Schmidt worked as an independent broker for the health care plans offered by defendants Foundation Health (Foundation) and St. Joseph's-Omni Health Plan, Inc. (Omni), and received a commission from defendants for the clients he obtained. In an effort to increase his client base, plaintiff offered to rebate his commission to prospective clients. Defendants

believed this rebate scheme violated provisions of the Act and an implementing regulation, and terminated their relationships with plaintiff.

Plaintiff filed suit against defendants, alleging numerous causes of action including conspiracy to restrain trade, tortious interference with contract and prospective economic relationships, and slander. Defendants successfully demurred to the slander cause of action as contained in plaintiff's second amended complaint, and the trial court subsequently sustained defendants' demurrer to the remaining causes of action as alleged in the fourth amended complaint.

Plaintiff appeals from the ensuing judgment of dismissal, asserting his rebate plan was legal and the slander allegations were sufficient to withstand a demurrer. We conclude the trial court properly found plaintiff's rebate offer violated the Act and regulation 1300.46. We further conclude the court properly sustained defendants' demurrer to the slander cause of action, and shall therefore affirm the judgment.

## STANDARD OF REVIEW

■ A demurrer tests the sufficiency of the complaint by raising questions of law. (*Aragon-Haas* v. *Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 238 [282 Cal.Rptr. 233]; Code Civ. Proc., § 589, subd. (a).) ■ "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; accord, *Crowley* v. *Katleman* (1994) 8 Cal.4th 666, 672 [34 Cal.Rptr.2d 386, 881 P.2d 1083].)

In reviewing the legal sufficiency of a demurrer, we are not concerned with plaintiff's ability to prove the allegations of the complaint, or the possible difficulties in making such proof. Neither are we bound by the trial court's construction of the pleadings; instead, we exercise our independent judgment in determining whether the complaint states a cause of action. (*Aragon-Haas* v. *Family Security Ins. Services, Inc.*, *supra*, 231 Cal.App.3d at pp. 238-239.)

With these principles in mind, we turn to the complaint at issue here.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's complaint alleged the following background information: Plaintiff was a "licensed independent health insurance agent" doing business in San Joaquin County. Defendants were the two predominant health care service plans in the area. In January 1991, plaintiff entered into agreements with defendants to "promote [defendants'] various . . . health plans to his client groups." In return, defendants were to "provide marketing materials, group quotations, and marketing support as needed . . . ." Defendants were to accept plaintiff as the broker of record for the client groups appointing him as such, and pay plaintiff a monthly commission for these accounts in accordance with defendants' standard commission schedule.

During 1991, plaintiff made sales calls on numerous client groups, worked with defendants in obtaining quotations, and had Omni employees accompany him on sales calls. Plaintiff alleged that in making sales calls, he "advised potential client groups that he would save them money on his services and thereby reduce their health insurance costs by legally rebating a portion of his commission to them in the event they selected him as their Broker of Record. He further advised such client groups that they were welcome to contact [defendants] about this rebate proposal."

On January 6, 1991, one company, Qualex, appointed plaintiff as its broker of record for all of its Foundation coverage, and a few days later, another company, MEPCO, appointed plaintiff for its Omni coverage. Plaintiff had a "reasonable probability" of being appointed broker of record by numerous other companies and was in the process of finalizing agreements with them. However, toward the end of January 1991, Omni notified plaintiff that it would not accept him as broker of record for MEPCO "because he had agreed to rebate a portion of his commission to that client." Similarly, after Foundation "informed Qualex that plaintiff's rebate policy was illegal," Qualex canceled the appointment of plaintiff as its broker of record. Plaintiff alleged defendants also "advised some or all of [his] prospective clients that plaintiff's rebate offers were illegal, unethical and 'shady,' " causing the prospective clients to break off negotiations with plaintiff.

Defendants notified plaintiff that they were terminating their relationships with him and would no longer do business with plaintiff "because he offered clients rebates of his commission."

Plaintiff attempted to file an appropriate complaint against defendants for restraint of trade, breach of the covenant of good faith and fair dealing, and various torts, including slander. Defendants successfully demurred to four

such complaints, with the trial court granting plaintiff leave to amend all causes of action except the one alleging a claim for slander. As discussed in detail below, the trial court concluded the allegedly defamatory statements outlined in plaintiff's second amended complaint were nonactionable statements of opinion.

Plaintiff's final complaint, the fourth amended complaint, alleged eleven causes of action, including conspiracy to restrain trade, breach of the covenant of good faith and fair dealing, tortious interference with contract, tortious interference with prospective economic relationships, conspiracy to interfere with existing and prospective economic relationships, and intentional misrepresentation. Defendants demurred to this complaint, noting plaintiff's claims were all predicated on the assumption that defendants wrongfully refused to do business with plaintiff due to his rebate practices, and wrongfully told plaintiff's clients that these practices were illegal. Defendants asserted plaintiff's rebate policy was, in fact, contrary to the Act and, more particularly, a regulation promulgated in furtherance of the Act, regulation 1300.46. This regulation provides: "No person subject to the provisions of the Act shall offer or otherwise distribute any bonus or gratuity to potential subscribers for the purpose of inducing enrollment or to existing subscribers for the purpose of inducing the continuation of enrollment."

Plaintiff asserted regulation 1300.46 was inapplicable because it did not specifically prohibit rebating, and the words "bonus" or "gratuity" could not be interpreted to include "rebate." He further argued that he did not offer rebates for the proscribed purpose of inducing enrollment or continuation of enrollment, but simply to "persuade subscribers to cho[o]se him as their broker of record, regardless of which plan they chose."

The trial court concluded plaintiff's rebate practice was prohibited by regulation 1300.46, and sustained defendants' demurrers to the complaint. Plaintiff appeals from the ensuing judgment of dismissal.

DISCUSSION

I. *Overview of the Act*

The Act (Health & Saf. Code, § 1340 et seq. [all subsequent statutory references are to the Health and Safety Code unless otherwise indicated]) regulates health care service plans and establishes standards for such plans.[1] This comprehensive statutory scheme is designed "to promote the delivery

---

[1]"Health care service plan" is defined as "any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any

of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a health care service plan or specialized health care service plan." (§ 1342.)

This goal is to be achieved through a variety of means, including education, to promote rational consumer choices. Thus, the Act is designed in part to "assur[e] that subscribers and enrollees are educated and informed of the benefits and services available in order to enable a rational consumer choice in the marketplace." (§ 1342, subd. (b).) Similarly, the Act "[p]rosecut[es] malefactors who make fraudulent solicitations or who use deceptive methods, misrepresentations, or practices which are inimical to the general purpose of enabling a rational choice for the consumer public." (§ 1342, subd. (c).)

Numerous provisions of the Act reflect the goal of creating an informed consumer public. For example, health care service plans must disseminate disclosure forms outlining the plan's benefits, services and terms of the plan contract, "so as to afford the public, subscribers, and enrollees with a full and fair disclosure of the provisions of the plan in readily understood language and in a clearly organized manner." (§ 1363, subd. (a).) Health care service plans may solicit and advertise but price advertising must be exact and verifiable, and cannot "be fraudulent, deceitful, or misleading, nor contain any offers of discounts, premiums, gifts, or bait of similar nature." (§ 1395, subd. (a).)

Solicitation for health care plans is defined by the Act as "any presentation or advertising conducted by, or on behalf of, a plan, where information regarding the plan, or services offered and charges therefor, is disseminated for the purpose of inducing persons to subscribe to, or enroll in, the plan." (§ 1345, subd. (k).) Solicitations may be done by the plan itself, or by a solicitor or solicitor firm. (§ 1345, subd. (k), (*l*), (m).)[2] A health service plan bears responsibility for advertising published on its behalf. (§§ 1360, 1361; see also § 1386, subd. (b)(9) [plan may be disciplined for permitting the commission of any illegal act].)

---

part of the cost for such services, in return for a prepaid or period charge paid by or on behalf of such subscribers or enrollees." (§ 1345, subd. (f).)

"Person" includes individuals, associations, organizations, partnerships, and corporations. (§ 1345, subd. (i).) A "subscriber" is the "person who is responsible for payment to a plan or whose employment or other status, except for family dependency, is the basis for eligibility for membership in the plan," while an "enrollee" is "a person who is enrolled in a plan and who is a recipient of services from the plan." (§ 1345, subds. (o), (c).)

[2]Solicitors and solicitor firms may be required to meet certain standards and qualifications "appropriate in the public interest or for the protection of subscribers, enrollees, and plans." (§ 1359.)

Responsibility for the enforcement and administration of the Act is vested in the Commissioner of Corporations (Commissioner) (§ 1341), who may adopt rules and orders necessary to carry out the Act's provisions (§ 1344, subd. (a); see also § 1346 [outlining powers of Commissioner]). The Commissioner may discipline health service plans and solicitors for violations of the Act and its related rules and regulations. (§§ 1386, subd. (a), 1388, subd. (a).) Potential disciplinary measures are numerous and include civil penalties (§§ 1386, subd. (a), 1387, subd. (a), 1388, subd. (a)), license suspension or revocation (§ 1386, subd. (a)), suspension or barring of a solicitor (§ 1388, subd. (a)), equitable relief (§ 1392), and criminal prosecution (§ 1390).

## II. *Rebate Practices and Regulation 1300.46*

In addition to section 1395, subdivision (a), which prohibits advertising containing "any offers of discounts, premiums, gifts, or bait of similar nature," regulation 1300.46 further limits health plan solicitations. As noted, this regulation provides: "No person subject to the provisions of the Act shall offer or otherwise distribute any bonus or gratuity to potential subscribers for the purpose of inducing enrollment or to existing subscribers for the purpose of inducing the continuation of enrollment." Defendants successfully demurred to plaintiff's complaint on the basis that regulation 1300.46 precludes plaintiff from offering to rebate to his clients a portion of the commission paid by defendants. Launching a multipronged attack on this interpretation of the Act and its regulations, plaintiff asserts his rebate plan is proper and legal. We disagree.

■ Citing the language of regulation 1300.46, plaintiff asserts neither he nor the rebate plan falls within the regulation's purview. The assertion cannot withstand scrutiny.

■ Generally, the same rules governing the construction and interpretation of statutes apply to the construction and interpretation of administrative regulations. (*In re Richards* (1993) 16 Cal.App.4th 93, 97-98 [19 Cal.Rptr.2d 797].) Accordingly, " 'we begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] 'An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' [Citations.] Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. [Citations.] 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' " (*California Teachers Assn.* v. *San*

*Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

Moreover, remedial or protective statutes and regulations must be liberally construed "to effect their object and quell the mischief at which they are directed." (*Kim* v. *Servosnax, Inc.* (1992) 10 Cal.App.4th 1346, 1356 [13 Cal.Rptr.2d 422]; *Montessori Schoolhouse of Orange County, Inc.* v. *Department of Social Services* (1981) 120 Cal.App.3d 248, 256 [175 Cal.Rptr. 14].) "The construction of an administrative regulation and its application to a given set of facts are matters of law." (*Auchmoody* v. *911 Emergency Services* (1989) 214 Cal.App.3d 1510, 1517 [263 Cal.Rptr. 278].)

■ In asserting regulation 1300.46 is inapplicable to his case, plaintiff cites various parts of the regulatory language. First, he contends he is not a person subject to the Act as outlined by the regulation because as a licensed insurance agent, he is exempt from the Act's provisions. In making this claim, plaintiff relies on section 1343, subdivision (e)(1), which provides that the Act does not apply to "[a] person organized and operating pursuant to a certificate issued by the Insurance Commissioner unless the entity is directly providing the health care service through those entity-owned or contracting health facilities and providers, in which case this chapter shall apply to the insurer's plan and to the insurer."[3]

This provision is irrelevant to the present case. While plaintiff is a licensed insurance agent, he was not acting as such in soliciting clients for defendants' health plans. As defendants note, plaintiff essentially wore two hats in his professional life, one as an insurance agent and the other as a broker of health plans. In engaging in solicitation activities, plaintiff was not selling insurance or "operating pursuant to" his insurance license. The exemption of section 1343, subdivision (e)(1), is therefore inapplicable.[4] Solicitation of clients for health care plans is clearly an activity within the scope of the Act.

Plaintiff next suggests that regulation 1300.46 is inapplicable because it prohibits only the distribution of "any bonus or gratuity," not a rebate. Again, we disagree. ■ "Bonus" is generally understood as "something in addition to what is expected or strictly due . . . ." (Webster's New Collegiate Dict. (9th ed. 1984) p. 167.) ■ A rebate is "a return of a part of a payment . . . ." (Webster's New Collegiate Dict., *supra*, at p. 981.)

---

[3]Prior to September 1994, the identical provision was found in section 1343, subdivision (d)(1). (See, e.g., Stats. 1989, ch. 1360, § 81, p. 5838.)

[4]Similarly, the fact that rebating by insurance brokers is permissible since the passage of Proposition 103 (see Ins. Code, § 750, subd. (d)) is irrelevant. Plaintiff was not selling insurance here, but soliciting clients for health care service plans.

 In rebating to his clients a portion of the commission he received, plaintiff reduced the amount the clients would otherwise have to pay for coverage. Such a payment reduction clearly constitutes a "bonus" and is prohibited under the regulation.[5]

Plaintiff next contends regulation 1300.46 is inapplicable because it precludes the distribution of bonuses and gratuities only to potential or existing "subscribers." Plaintiff asserts that because his offer was made to employers and not to the individual employees who signed up for the plan, the offer was not made to "subscribers." The statutory definitions compel a different conclusion. Section 1345, subdivision (o), defines "subscriber" as the "person[6] who is responsible for payment to a plan or whose employment or other status, except for family dependency, is the basis for eligibility for membership in the plan." In contrast, an "enrollee" is "a person who is enrolled in a plan and who is a recipient of services from the plan." (§ 1345, subd. (c).) Thus, an enrollee is the person actually receiving the health care services, while a subscriber may be that person, another individual, or an employer who is responsible for payment to the plan. In other words, an employer may be a subscriber, but is not an enrollee.[7]

If the Legislature and Commissioner wished to foreclose improper inducements to enrollment only if made to the person actually receiving the health care services, the regulation would have been worded differently and prohibited the distribution of bonuses or gratuities to existing or potential *enrollees*. The fact that the regulation refers to subscribers rather than enrollees indicates an intent to bar such inducements to either employees or employers as the party responsible for payment to a plan. This conclusion is

---

[5]In his reply brief, plaintiff suggests that some of the employer groups might not have paid any portion of their employees' health care premiums and therefore no "bonus" was involved. To the extent that is true, the rebate scheme is a prohibited gratuity, i.e., "something given voluntarily or beyond obligation usu[ally] in return for or in anticipation of some service." (Webster's New Collegiate Dict., *supra*, at p. 534.)

[6]"Person" means "any person, individual, firm, association, organization, partnership, business trust, foundation, labor organization, corporation, limited liability company, public agency, or political subdivision of the state." (§ 1345, subd. (i).)

[7]Although plaintiff vehemently insists an employer is not a subscriber, we note that on at least two occasions, even plaintiff used this term in referring to employers. For example, at the hearing on the demurrer to the fourth amended complaint, plaintiff's attorney argued that "what [plaintiff] was doing in the main was not inducing new subscribers to a new plan or existing subscribers to a different plan, but going to *existing subscribers*, for example, of Foundation and asking them to appoint [plaintiff] as their broker." (Italics added.) Similarly, in his opening brief on appeal, plaintiff asserted he was simply saying to prospective clients: "You are already an Omni *subscriber* using the brokerage services of a competitor of mine—make me your broker for the Omni plan, and I will provide those services for less by rebating[.]" (Italics added.)

bolstered by the Legislature's clear intent to create an atmosphere in which consumers choose health plans on a rational, educated basis. (See, e.g., §§ 1342, subds. (b), (c), 1363.) If brokers were allowed to lure employers to sign up with a particular plan through rebates or other inducements irrelevant to the objective merits of a particular plan, this intent would be thwarted. Contrary to plaintiff's claim, the Act is not simply designed to "prevent plans from getting employees to sign up by offering them gifts (such as TV sets, toaster ovens, etc.), thus diverting their attention from the intrinsic merits of the different available plans." Bait dangled in front of an employer who is selecting a plan for its employees poses the identical threat to informed choice. To forbid direct gifts to employees while permitting rebates to employers would render the Act's protections illusory.

Finally, plaintiff contends regulation 1300.46 does not apply because he did not solicit clients for the prohibited purpose of inducing enrollment or continuation of enrollment in defendants' health plans. Instead, he insists, he simply wanted these clients to use him as their broker. This distinction is chimerical. In any event, plaintiff's complaint indicates otherwise. The complaint alleged plaintiff entered into agreements with defendants to "promote [defendants'] various . . . health plans to his client groups." Defendants provided marketing materials and support, as well as group quotations for these clients. Plaintiff made numerous sales calls on client groups, sometimes even accompanied by Omni employees, and spent "substantial time and effort in soliciting clients for defendants' plans and in identifying prospects to defendants." Plaintiff alleged defendants were to pay him a commission "in part to recover his time and expense in promoting defendants' plans." Plaintiff's rebate offer was made in conjunction with these activities. Thus, the allegations of the complaint indicate that plaintiff intended to induce enrollment, or continued enrollment in defendants' plans, with plaintiff to be appointed as broker of record.[8] This is precisely the purpose prohibited by regulation 1300.46.

 Plaintiff asserts this interpretation violates the antitrust provisions of the Cartwright Act (Bus. & Prof. Code, § 16600 et seq.) by permitting an unlawful restraint of trade. As he sees it, "[t]his case presents the quintessential restraint on trade—a conspiracy to effect a boycott of a competitor because his price is too low." Once again, we disagree. It is clear from the extensive statutory scheme outlined in the Act that the Legislature

---

[8]In the complaint, plaintiff alleged: "By custom and practice, a client group designates a health insurance agent to represent it, which is accomplished by submitting a letter to the particular HMO appointing the agent that client's Broker of Record. Upon receiving such an appointment of an agent *whom it has authorized to promote its plans*, the HMO will accept the agent as that client's Broker of Record and pay any commission." (Italics added.)

intended to occupy completely the field of health service plans. The duty to regulate health plans and protect the public interest is completely vested in the Commissioner and Department of Corporations (Department). (*Van de Kamp* v. *Gumbiner* (1990) 221 Cal.App.3d 1260, 1285 [270 Cal.Rptr. 907].) Any intrusion into this regulatory function by seeking remedies in other venues and supplanting that authority must be viewed with caution. (See *id.* at pp. 1284-1285; *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301-1302 [22 Cal.Rptr.2d 20].)

The Cartwright Act generally prohibits only *unreasonable* restraints of trade. (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 930 [130 Cal.Rptr. 1, 549 P.2d 833].) However, some practices may be presumed to be unreasonable because of their pernicious effect on competition and lack of any redeeming virtues. (*Id.* at pp. 930-931.) Prohibiting the rebating of commissions is not a practice deserving of such a presumption. This prohibition does not preclude independent agents from brokering health insurance plans; it simply precludes the use of sales tactics that detract from a proper evaluation of a plan. Barring the use of rebates serves legitimate purposes by enabling subscribers to make informed decisions without being enticed by factors extraneous to a particular plan's merits. The restraint on trade, if any, is clearly reasonable as a matter of law.[9] There is no violation of the Cartwright Act.

Plaintiff also contends that prohibiting broker rebates violates the federal antitrust protections of the Sherman Act. (15 U.S.C. § 1 et seq.) This claim was never raised at the trial level and cannot be tendered for the first time on appeal. (*GHK Associates* v. *Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872 [274 Cal.Rptr. 168].) Plaintiff's complaint explicitly prayed that defendants "be found liable for violation of the antitrust laws of the State of California . . . ." No mention was made of any violation of federal law. This case is therefore unlike *Alpha Beta Mkts.* v. *Amal. Meat Cutters* (1956)

---

[9]As the trial court recognized, to hold otherwise would put health care service plans in an untenable position. Unlike the situation in *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d at pages 924-925, where realtors voluntarily agreed as a group to limit membership in their association to people primarily engaged in the real estate business and deny access to its multiple listing service to nonmembers, here defendants acted according to statutorily imposed requirements. The Act prohibits health care service plans from doing business with solicitors who engage in improper advertising activity. (§§ 1360, 1361, 1386.) Once defendants became aware of plaintiff's rebate policy, they were obligated to stop doing business with plaintiff in order to avoid possible disciplinary measures. For plaintiff to suggest that defendants should have continued to use plaintiff as their broker is to suggest that defendants should have been willing to face criminal and civil penalties, including the possible loss of their licenses. (§§ 1386, 1387, 1390.) Defendants are under no such obligation.

147 Cal.App.2d 343 [305 P.2d 163], a case cited by plaintiff, in which labor unions sought declaratory relief to determine whether provisions in a collective bargaining agreement constituted unlawful restraints of trade under both federal and state law. (*Id.* at p. 345.) Given the clear posture of plaintiff's complaint, we conclude this is not a proper case in which to exercise our discretion to resolve an issue that was not tendered below. (See *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 115, fn. 5 [284 Cal.Rptr. 318, 813 P.2d 1348].)[10] Plaintiff's antitrust claims are unavailing.

In sum, the Act is designed to ensure informed choices on health care by eliminating inducements which might result in the selection of a plan for reasons unrelated to a plan's merits. Section 1395, subdivision (a), therefore forbids advertising which is fraudulent or misleading, or contains "any offers of discounts, premiums, gifts, or bait of similar nature." Regulation 1300.46 prohibits a solicitor from giving "any bonus or gratuity" to potential or existing subscribers. Plaintiff's offer to rebate his commission to his clients violates this provision and the clear spirit of the Act.[11]

### III. *Slander*

Plaintiff asserts the allegations in his slander cause of action, contained in his second amended complaint, were sufficient to withstand demurrer. Our analysis above compels a different conclusion.

Plaintiff's slander cause of action incorporated paragraph 12 of the second amended complaint, which alleged defendants' managers "intentionally provided dozens of [plaintiff's] client groups with false information concerning commission rebates. It is also believed that this same misinformation was

---

[10]This case also differs from others cited by plaintiff, such as *Big Top Toy Stores, Inc.,* v. *Ardsley Toy Shoppe, Ltd.* (1970) 64 Misc.2d 894 [315 N.Y.S.2d 897, 908], in which a defendant asserted plaintiff's cause of action could not lie because it was based on violation of federal antitrust statutes. Here, plaintiff is not citing these provisions as a defense, but instead seeks affirmative relief. The Sherman Act clearly provides that such relief must be sought in federal court. (15 U.S.C. § 15(a).)

[11]Defendant Omni filed with this court a copy of a June 1994 interpretive ruling by the Department regarding regulation 1300.46. Blue Shield of California sought the Department's opinion on the legality of an insurance service's Yellow Pages advertisement offering a rebate on Blue Cross and Blue Shield coverage. The Department advised that section 1395, subdivision (a), and regulation 1300.46 "prohibit rebates of commissions, and the offer or advertisement of rebates of commissions, by any person subject to the Act," and concluded that "all health care service plans and all solicitors and solicitor firms are required to comply with [these provisions]." While we recognize that it is ultimately our function to determine the proper interpretation of a regulation, an administrative agency's interpretation of its own regulation deserves great weight. (*In re Richards, supra,* 16 Cal.App.4th at p. 98.)

passed on to other agents, who in turn quickly spread it throughout the business community. The untrue statements about commission rebates include: 'That they are illegal,' 'That they violate Dept. of Corporations' regulations,' 'That they are shady and unethical.' [Defendants' managers] were all in positions of authority with superior knowledge to those receiving the information which resulted in justifiable reliance."

The complaint further alleged: "During the period from December 1991, through January 1992, managers at both [defendants'] Stockton offices spoke with numerous of [plaintiff's] client groups and wrongfully made derogatory and defamatory statements about [plaintiff] conducting his business in an illegal and/or unethical manner. [Defendants' managers] knowingly made false and defamatory statements to [plaintiff's] client groups concerning his violating the law and his truthfulness. These statements were intended to be and in deed [*sic*], were accepted as 'matters of fact'. [Defendants] even cited the specific California codes that [plaintiff] was purportedly violating. . . . [Defendants] were making statements of verifiable fact and not mere opinion."

The trial court sustained defendants' demurrer to the slander cause of action on the ground that the allegedly defamatory statements were nonactionable statements of opinion, a characterization plaintiff challenges on appeal.

Defendants were entitled to judgment on this cause of action. Slander involves a false and unprivileged oral publication. (Civ. Code, § 46.) As our opinion today makes clear, plaintiff's rebate scheme was in fact illegal and violated regulation 1300.46. Consequently, any statements made by defendants that plaintiff's rebates were illegal and violated the Department's regulations were true. Illegal acts can properly be termed "unethical" or "shady." Thus, the statements plaintiff alleged to be defamatory were in fact true. Without a *false* statement of fact, there is no actionable defamation. Although the trial court sustained the defendants' demurrer to this cause of action on the ground that the statements constituted expressions of opinion rather than factual truths, this ruling does not merit reversal. "Although the reason stated by the trial court in sustaining the demurrer to the slander cause of action was erroneous, that error was harmless. Truth is a complete defense to civil liability for defamation." (*Gill* v. *Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306]; see also *Francis* v. *Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 539-540 [4 Cal.Rptr.2d 361].)

## DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Davis, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 19, 1995.