Filed 6/10/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| JOSEPH R. ERLACH, | H038594 |
| Plaintiff and Appellant, | (Monterey County Super. Ct. M115493) |
| v. | |
| SIERRA ASSET SERVICING, LLC, | |
| Defendant and Respondent. | |


John Erlach (appellant) appeals from a judgment of dismissal of his complaint against Sierra Asset Servicing LLC (Sierra) entered after the trial court sustained Sierra's demurrer without leave to amend. Appellant contends that it was error for the trial court to determine that his residential lease was void and that he was a squatter with no legal rights because a code enforcement notice (red tag) terminated his original tenancy, and to determined that any subsequent lease with Sierra was an illegal contract and void.[1] We agree and reverse the judgment of dismissal.

*Factual and Procedural Background*

Our factual summary is derived from appellant's complaint.[2]

---

[1] In support of appellant's position the Western Center on Law and Poverty has filed an amicus curiae brief on behalf of the Homeowner Bill of Rights Collaborative.

[2] On demurrer, "we must accept as true all properly pleaded material facts and facts that may be inferred from these allegations . . . . " (*Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1411; see *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1374.)

Starting in 2009, appellant was the tenant/lessee of one bedroom, one bathroom and all the common areas of the residence at 7171 Oak Tree Place in Monterey. Mary Schwann (Schwann) was the owner of the premises. On April 6, 2010, appellant and Schwann entered into a written agreement whereby appellant paid $3,500 in advance to rent the property for seven months ($500 a month) covering the period from April 1, 2010 to October 30, 2010. At some point, appellant had paid a $600 security deposit. On October 9, 2010, appellant and Schwann entered into a modification of the agreement whereby appellant paid an additional $500 to extend the agreement to November 30, 2010.

Late in October 2010, Schwann had the gas and electricity services to the property turned off; she said it was because other tenants had failed to pay rent. Appellant demanded that Schwann restore the utilities, but Schwann refused and told appellant that she was going to " 'freeze [him] out.' " Thereafter, Schwann turned off the water service despite the fact that appellant's name was on the account. On November 8, 2010, a code enforcement inspector for the county "red tagged" the property for " 'no electric, no heat, no hot water.' " Appellant was precluded from occupying the property except to gather his belongings.

Four days later, on November 12, 2010, the property was sold in a foreclosure sale to Sierra. After the foreclosure sale, appellant met with Sierra's representative and explained that he had a lease with Schwann; the representative stated that appellant could stay for the remainder of the lease, but work needed to be done on the property. Sierra began work on the premises removing the carpets, flooring, and kitchen and bathroom fixtures; appellant objected.

On November 15, 2010, appellant spoke with Brian Grocott, Sierra's agent. Grocott told appellant that he could stay in the property until the end of December using appellant's $600 security deposit as rent for that month; Grocott said the property would be repaired and restored promptly. From November 15 to December 3, 2010, repeatedly,

appellant requested that Sierra restore the property as promised. On December 3, 2010, Sierra told appellant that the property was ready for him. However, the property was not restored. Some of appellant's belongings were missing and the kitchen and bathroom had not been restored; piles of construction garbage were left throughout the property. The flooring and wall coverings were missing. On December 27, 2010, the property had still not been restored; the red-tag was still on the property and so appellant moved out.

Appellant filed a complaint for unspecified damages alleging eight causes of action against Schwann and Sierra:[3] 1) "Violation of California Civil Code Section 1942.4"; 2) "Tortious Violation for Breach of the Warranty of Habitability"; 3) "Intentional Infliction of Extreme Emotional Distress"; 4) "Negligent Infliction of Extreme Emotional Distress"; 5) "Negligence: Violation of Duty to Maintain Habitable Conditions"; 6) "Constructive Eviction"; 7) "Breach of the Covenant of Quiet Enjoyment"; 8) "Retaliatory Eviction."

Sierra demurred to every cause of action in the complaint on the ground that Sierra "had no lease with" appellant and that "there was no obligation at law that compelled SIERRA to take any action regarding SCHWANN's former tenant . . . . Further, even if the subject lease between SCHWANN and [appellant] were somehow valid, the red-tagging by the County terminated the lease, immediately relieving the parties thereto, and any party in purported privity therewith, of all obligations under that lease, as performance of the contract terms were [sic] excused, because of impossibility due to an action not taken by one of the parties (County of Monterey). Per Civil Code § 1933, when the premises underwent construction for the County to lift the red tag, the property, as it was originally contracted for, was 'destroyed,' which terminated the 'hiring' or agreement. Lastly, any new agreement between [appellant] and SIERRA, whereby SIERRA would assume any debt to [appellant] or default by SCHWANN described in

---

[3] Schwann is not a party to this appeal.

3

the [complaint] would have to have been in writing, per the statute of frauds, and [appellant] has not alleged that there ever was any such written agreement."[4]

After oral argument, the trial court sustained the demurrer without leave to amend on the ground that no landlord-tenant relationship existed between appellant and Sierra because the tenancy between appellant and defendant Mary Schwann "had already been terminated by the county's red tag" before Sierra took possession of the premises. Further, any lease between Sierra and appellant "while the premises were red tagged would have been void as unlawful and in violation of public policy." Later the court stated that when Sierra took over the property, appellant was "just a squatter at that time with no legal rights."

The trial court indicated that it could not automatically dismiss the action against Sierra without a noticed motion to dismiss. Accordingly, the court instructed counsel for Sierra to file a noticed motion to dismiss, which the court heard and granted on April 27, 2012. The signed order entitled "ORDER GRANTING DEFENDANT SIERRA ASSET SERVICES LLC'S MOTION TO DISMISS SAID DEFENDANT FROM PLAINTIFF'S COMPLAINT, WITH PREJUDICE, AND GRANTING JUDGMENT OF DISMISSAL" is dated April 27, 2012. According to the clerk of the court, no notice of entry of order granting Sierra's motion to dismiss is in the court file. Appellant filed a notice of appeal from the court's April 27, 2012, judgment dismissing Sierra from the case on June 28, 2012.

As an initial matter, although appellant's form notice of appeal refers to a judgment of dismissal, the appellate record contains no judgment. Thus, this appeal

---

[4]    Under the statute of frauds, to be enforceable an agreement for the lease of real property *for more than one year must be in writing signed by the party to be charged*. (Civ. Code, § 1624, subd. (a)(3), italics added.) However, a party's partial or full performance of an oral agreement to lease real property can take the contract out of the statute of frauds. (*Harrison v. Hanson* (1958) 165 Cal.App.2d 370, 376.)

4

appears to have been taken from the order sustaining Sierra's demurrer to appellant's complaint and granting Sierra's motion for dismissal. "Orders sustaining demurrers are not appealable." (*Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1695; *Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1019.) Nevertheless, "an appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal." (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920.) It is particularly appropriate to do so when the absence of a final judgment results from inadvertence or mistake (*id.* at p. 92), and Sierra prepared the order and does not argue for dismissal of the appeal.

### *Standard of Review*

"In determining whether [a] plantiff[] has properly stated a claim for relief, our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) Our review is de novo. (*Ibid.*) The purpose of a demurrer is to test the sufficiency of the pleadings to state a cause of action as a matter of law. (*Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1153.) We are not concerned with plaintiff's ability to prove the allegations or with any possible difficulties in making such proof. (*Schmidt v. Foundation Health* (1995) 35 Cal.App.4th 1702, 1706.)

*Discussion*

The determination whether the court erred in sustaining Sierra's demurrer without leave to amend and dismissing the case rests squarely on whether the court was correct in holding that the red-tagging of Schwann's property automatically terminated appellant's lease with Schwann; and that any lease between Sierra and appellant was void as against public policy.

In support of the argument that a red tag placed on a property terminates a lease, Sierra cites Health and Safety Code section 17910 et seq. Sierra argues that despite appellant's contention that the property was red-tagged due to the lack of utilities, the provisions of the Health and Safety Code "make it clear that the property could only be red-tagged due to extensive building code violations [that] endanger the health and safety of residents." This argument does not advance Sierra's position.

We are not persuaded by Sierra's argument for the simple reason that Health and Safety Code section 17920.3 provides, "Any building or portion thereof including any dwelling unit, guestroom or suite of rooms, or the premises on which the same is located, in which there exists *any* of the following listed conditions to an extent that endangers the life, limb, health, property, safety, or welfare of the public or the occupants thereof shall be deemed and hereby is declared to be a substandard building." (Italics added.) Included in the listed conditions are the lack of, or improper water closet, lavatory, or bathtub or shower in a dwelling unit, lack of hot and cold running water to plumbing fixtures in a dwelling unit, lack of adequate heating, and lack of required electric lighting (Health & Saf. Code, § 17920.3, subds. (a)(1), (5), (6) & (10)—all of which would have been present after Schwann had the utilities turned off.[5] Furthermore, we can find

---

[5]     Similarly, Civil Code section 1941.1 specifies the dilapidations that permit a tenant to exercise the remedies provided by Civil Code section 1941 and 1942. A

6

nothing in Health and Safety Code section 17910 et seq. that supports Sierra's argument that the red-tagging of a property terminates a lease. In fact, as we shall explain, there is support for the contrary proposition; that is, that a tenancy survives the red-tagging of a property.

Throughout much of its argument Sierra conflates the right to occupy with the right to maintain a tenancy. A tenancy is not terminated when a building inspector orders the tenants to vacate the property due to unsafe conditions. Rather, pursuant to Civil Code section 1941, with exceptions not relevant here, and Health and Safety Code section 17980.6, the landlord must put the property into a condition fit for occupation and repair all subsequent dilapidations.

As our Supreme Court explained in *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, "[s]ections 17980.6 and 17980.7 of the Health and Safety Code compose a statutory scheme providing certain remedies to address substandard residential housing that is unsafe to occupy." (*Id.* at p. 912.)

Pursuant to Health and Safety Code section 17980.6, if any building is maintained in a manner that violates the State Housing Law, or applicable building standards, rules, regulations, or local ordinances and the violations are so extensive and of such a nature

---

dwelling will be deemed untenantable for purposes of Civil Code section 1941 "if it substantially lacks *any* of the following affirmative standard characteristics . . . . [¶] (2) Plumbing or gas facilities that conformed to applicable law in effect at the time of installation, maintained in good working order. ¶ (3) A water supply approved under applicable law that is under the control of the tenant, capable of producing hot and cold running water, or a system under the control of the landlord, that produces hot and cold running water, furnished to appropriate fixtures, and connected to a sewage disposal system approved under applicable law. [¶] (4) Heating facilities that conformed with applicable law at the time of installation, maintained in good working order. [¶] (5) Electrical lighting, with wiring and electrical equipment that conformed with applicable law at the time of installation, maintained in good working order." (Italics added.) Again, all these characteristics would have been present when Schwann had all the utilities turned off.

7

that the health and safety of residents or the public is substantially endangered, the enforcement agency may issue an order or notice to repair or abate. Any such order or notice must be both posted in a conspicuous place on the property and sent by first-class mail to each affected residential unit, or posted in a conspicuous place on the property and in a prominent place on each affected residential unit. The order or notice must include the name, address, and telephone number of the agency that issued the notice or order; the date, time, and location of any public hearing or proceeding concerning the order or notice; and information that the *lessor cannot retaliate against a lessee.*

Pursuant to Health and Safety Code section 17975, "Any *tenant* who is displaced or subject to displacement from a residential rental unit as a result of an order to vacate or an order requiring the vacation of a residential unit by a local enforcement agency as a result of a violation so extensive and of such a nature that the immediate health and safety of the residents is endangered, shall be entitled to receive relocation benefits from the owner as specified in this article." (Italics added.)

If the owner fails to comply within a reasonable time with the terms of the order or notice, the enforcement agency may seek and the court may order the imposition of criminal penalties and that the owner not claim any deduction with respect to state taxes for interest, taxes, expenses, depreciation, or amortization paid or incurred with respect to the cited structure. The court may order the appointment of a receiver, and order the owner to pay reasonable costs of the enforcement agency and to pay *compensation to tenants*. (Health & Saf. Code, §§ 17980.7, subds. (a), (b), (c) & (d), italics added.)[6]

On a finding that a building violates the State Housing Law, the enforcement agency or *a tenant* or *tenant association* or organization may seek an order appointing a

---

[6] We fail to see how Sierra's contention that Health and Safety Code section 17980.7, subdivision (b) applies only where the county seeks a court order to make repairs to the property advances its position that the red-tagging of a property automatically terminates a lease.

8

receiver for a substandard building.  The petition for appointment of a receiver must include proof that notice of the petition was served not less than three days before filing the petition to all persons with a recorded interest in the real property on which the substandard building exists.  (Health & Saf. Code, § 17980.7, subd. (c), italics added.)

If a receiver is appointed, the owner of the substandard building and his or her agent will *be enjoined from collecting rents from the tenants*, from interfering with the receiver in operating the substandard building, and from encumbering or transferring the substandard building or real property on which the building is situated.  (Health & Saf. Code, § 17980.7, subd. (c)(3).)  If the conditions of the premises or the repairs or rehabilitation significantly affects the safe and sanitary use of the substandard building by any tenant so that the tenant cannot safely *reside* in his or her unit, then the receiver must provide relocation benefits as specified by statute or local ordinance.  (Health & Saf. Code, § 17980.7, subds. (c)(5) & (6), italics added.)

Throughout this statutory scheme there are references to *tenants or lessees*, not former tenants or former lessees.  When we examine the words of a statute, we "giv[e] them their ordinary and usual meaning and view[] them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent." (*Gattuso v. Harte–Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567.)  We may infer from the Legislature's use of the word *tenant* in all of the aforementioned statutes that set out a tenant's rights and remedies *after* a building has been red-tagged that the Legislature contemplated that, although the tenant might not be able to *occupy* a building because of a red-tag, the *tenant* still had rights and remedies.  Giving the word tenant its ordinary and usual meaning, the aforementioned statutes plainly contemplate that a tenancy continues after a building is red-tagged.  A tenant is, by definition, in possession of the

property of the landlord. (*Board of Trustees of the Leland Stanford Junior University v. Ham* (2013) 216 Cal.App.4th 330, 339.)[7]

Significantly, 40 years ago, in *Green v. Superior Court* (1974) 10 Cal.3d 616 (*Green*), our Supreme Court recognized that where occupancy itself is not illegal, but the property does not conform to certain housing or building codes (as in this case) and the defects are, by definition, correctable, the tenant may, at his or her option, remain in possession and is relieved of the obligation to pay rent, but is liable for the reasonable value of the use and occupancy of the property in its defective condition. (*Id*. at pp. 638-639.)

In sum, we conclude that when Sierra bought the property at the foreclosure sale on November 12, 2010, appellant's tenancy had not been terminated; appellant had paid rent to extend his tenancy through to the end of November. The trial court erred in determining that the red-tagging of the property had terminated appellant's tenancy.

We point out that new owners of rental property are required to address outstanding code violations even if they were caused by the previous owner of the property. (See *Knight v. Hallsthammar* (1981) 29 Cal.3d 46, 57, 59 (*Knight*); *Hawthorne Savings & Loan Assn. v. City of Signal Hill* (1993) 19 Cal.App.4th 148, 162.)

---

[7]    There is one situation where the red-tagging of a building might lead ultimately to the termination of a tenancy. Health and Safety Code section 17980.7 provides that, if the owner fails to comply with the red-tag notice despite having been afforded a reasonable opportunity to do so, the enforcement agency may seek judicial appointment of a receiver to assume control over the property and remediate the violations or take other appropriate action. Other appropriate action includes ordering the demolition of the building. (*City of Santa Monica v. Gonzalez*, *supra*, 43 Cal.4th 905, 934.) However, "[i]n deciding whether to require vacation of the building or to repair as necessary, the enforcement agency shall give preference to the repair of the building whenever it is economically feasible to do so without having to repair more than 75 percent of the dwelling, as determined by the enforcement agency, and shall give full consideration to the needs for housing as expressed in the local jurisdiction's housing element." (Health & Saf. Code, § 17980, Stats. 2003, ch. 474, § 4.)

As to Sierra's argument that no landlord-tenant relationship was ever created between appellant and Sierra because such an agreement would have constituted a contract for an illegal purpose (since Sierra could not provide appellant with the right to occupy the property) we conclude that this does not preclude appellant's right to recover damages.

Rental agreements involving units that lack a certificate of occupancy are ordinarily regarded as unlawful and void. (*Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1047.) "This is because '[t]he object of a contract must be lawful [citation]; i.e., it must not be in conflict either with express statutes or public policy. . . . [Accordingly, i]f the contract has a single object, and that object is unlawful (whether in whole or in part), the entire contract is void.' [Citation.]" (*Ibid.*)

"Generally, 'the courts . . . will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act.' [Citation.] Our Supreme Court has explained: 'The reason for this refusal is not that the courts are unaware of possible injustice between the parties, and that the defendant may be left in possession of some benefit he should in good conscience turn over to the plaintiff, but that this consideration is outweighed by the importance of deterring illegal conduct. Knowing that they will receive no help from the courts and must trust completely to each other's good faith, the parties are less likely to enter an illegal arrangement in the first place. [Citations.]' [Citation.]" (*Carter v. Cohen*, *supra*, 188 Cal.App.4th at pp. 1047-1048.)

"Nonetheless, the rule barring the enforcement of unlawful contracts is not absolute. Because the rationale for the rule is founded on deterrence, the Supreme Court has made clear that courts ' "should not . . . blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the

11

one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied." ' [Citations.]" (*Carter v. Cohen*, *supra*, 188 Cal.App.4th at p. 1048.)

" '[W]hen the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his action against a defendant within the class primarily to be deterred. In this situation it is said that the plaintiff is not in pari delicto. [Citations.]' [Citation.] Courts have thus permitted parties to obtain benefits under a law enacted for their protection, despite their participation in transactions that contravened the law [citations]. Similarly, courts have permitted parties to enforce contracts that contravene statutes enacted for the parties' benefit [citation.]" (*Carter v. Cohen*, *supra*, 188 Cal.App.4th at p.1048.)

Although rental agreements regarding units lacking a certificate of occupancy are unlawful, their enforcement by tenants is subject to the aforementioned principles. (*Carter v. Cohen*, *supra*, 188 Cal.App.4th at at p.1048.)

Accordingly, we turn to appellant's complaint to determine whether he has stated viable claims. We begin by discussing tort claims and statutory claims involving a landlord-tenant relationship.

The California Supreme Court has held that because "under contemporary conditions, public policy compels landlords to bear the primary responsibility for maintaining safe, clean and habitable housing in our state," there is a warranty of habitability implied in residential leases in California. (*Green*, *supra*, 10 Cal.3d at p. 627.) In *Green*, the court explained that "[t]his implied warranty of habitability does not require that a landlord ensure that leased premises are in perfect, aesthetically pleasing condition, but it does mean that 'bare living requirements' must be maintained. In most

12

cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligations under the common law implied warranty of habitability we now recognize." (*Id.* at pp. 637, fns. omitted.) The court held that a tenant may assert the landlord's breach of the implied warranty of habitability as a defense to an unlawful detainer proceeding. (*Id.* at pp. 631-637.) Moreover, a landlord's obligation to maintain premises in a habitable condition is one that continues throughout the term of the lease. (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1204.) In the event of a landlord's breach of the implied warranty of habitability, the tenant is not absolved of the obligation to pay rent; rather the tenant remains liable for the reasonable rental value as determined by the court for the period that the defective condition of the premises existed. (*Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 914; *Hinson v. Delis* (1972) 26 Cal.App.3d 62, 70, disapproved on another ground in *Knight, supra,* 29 Cal.3d 46, 55, fn. 7; see also Code Civ. Proc., § 1174.2, subd. (a) [in unlawful detainer action after nonpayment of rent, where tenant proves substantial breach of habitability warranty, court determines reasonable rental value of premises in its untenantable condition].)

In addition to asserting a breach of the habitability warranty as a defense to an unlawful detainer action, a tenant may bring suit against the landlord for damages resulting from such breach. (*Landeros v. Pankey* (1995) 39 Cal.App.4th 1167, 1169; Miller & Starr, Cal. Real Estate (3d ed.2004) § 19:121, p. 362; Friedman et al., Cal. Practice Guide: Landlord-Tenant, (The Rutter Group 2009) ¶ 3:97-3:100, pp. 3-40.4 to 3-40.5.) The elements of such an affirmative claim are the existence of a material defective condition affecting the premises' habitability, notice to the landlord of the condition within a reasonable time after the tenant's discovery of the condition, the landlord was given a reasonable time to correct the deficiency, and resulting damages. (*Quevedo v. Braga* (1977) 72 Cal.App.3d Supp. 1, 7-8 (*Quevedo*), disapproved on other

grounds in *Knight, supra,* 29 Cal.3d at p. 55, fn. 7;[8] see also Friedman et al., *supra,* ¶ 3:100, p. 3-40.5.)

According to the *Quevedo* court, the measure of damages is the amount of rent that the landlord should refund, calculated by the difference between the rent paid while the premises were uninhabitable and the rent that "would have been reasonable, taking into account the extent to which the rental value of the property was reduced by virtue of the existence of the defect." (*Quevedo, supra,* 72 Cal.App.3d Supp. at p. 8.) Other methods of calculating a tenant's damages for breach of the habitability warranty include (1) the difference between the fair rental value of the premises had they been in the condition warranted and their fair rental value with the uninhabitable condition (*Green, supra,* 10 Cal.3d at p. 638), and (2) the rent paid by the tenant multiplied by the percentage of the premises rendered unusable due to the uninhabitable condition. (*Id.* at p. 639, fn. 24; *Cazares v. Ortiz* (1980) 109 Cal.App.3d Supp. 23, 33.)

In addition, there is a statutory cause of action available to the residential tenant where the premises are untenantable and other circumstances exist. Under Civil Code section 1942.4, a residential landlord may not demand or collect rent, increase rent, or serve a three-day notice to pay rent or quit if (1) the dwelling is untenantable as defined under section 1941.1, is in violation of section 17920.10 of the Health and Safety Code, or is deemed and declared substandard under section 17920.3 of the Health and Safety Code; (2) a public officer inspects the premises and gives the landlord written notice that it must abate the nuisance or repair the property; (3) the conditions have not been remedied within 35 days of the notice; and (4) the substandard conditions were not

---

[8]    In *Knight v. Hallsthammar, supra,* 29 Cal.3d at page 55 and footnote 7, the Supreme Court confirmed that breach of the implied warranty of habitability can support an independent cause of action for damages, but overruled *Quevedo* to the extent it required that a tenant be unaware of the defective condition upon occupancy and that a landlord with preexisting notice of the defect be given additional time to repair it.

caused by the tenant's acts or omissions.  (Civ. Code, § 1942.4, subd. (a).)  In the event

that each of the circumstances under subdivision (a) of the statute is satisfied, a tenant

may bring an action for actual damages plus statutory damages of between $100 and

$5,000.  (Civ. Code, § 1942.4, subd. (b)(1).)[9]

In *Stoiber v. Honeychuck*, *supra*, 101 Cal.App.3d 903 (*Stoiber*), the court held that

a tenant may maintain a tort action against his landlord for damages suffered by way of

annoyance or discomfort or for injury to his personal property caused by the landlord's

failure to keep the premises in a habitable condition under the expansive rationale of

*Rowland v. Christian* (1968) 69 Cal.2d 108.  (*Stoiber*, *supra*, 101 Cal.App.3d at pp. 916-

917, 918-919.)  The *Stoiber* court concluded "that the availability of a remedy for breach

of implied warranty of habitability does not preclude a tenant from suing his landlord for

intentional infliction of mental distress if the landlord's acts are extreme and outrageous

and result in severe mental distress."  (*Id*. at p. 922.)  Whether this is so under the present

allegations presents a factual question; however, it cannot be said as a matter of law that

appellant has not stated such a claim.

Furthermore, "the *negligent* infliction of emotional distress–anxiety, worry,

discomfort–is compensable without physical injury in cases involving the tortious

interference with *property rights* [citations]."  (*Stoiber*, *supra*, 101 Cal.App.3d at p. 922.)

---

[9]     We recognize that the mere "existence of a prohibited (uninhabitable) condition or other noncompliance with applicable code standards does not *necessarily* constitute a *breach* of the warranty of habitability."  (Friedman et al., Cal. Practice Guide: Landlord–Tenant (The Rutter Group 2012) § 3:39, p. 3–13, citing *Green, supra,* 10 Cal.3d at pp. 637–638.)  Whether a particular defect or violation of a housing code constitutes a breach of the implied warranty of habitability depends on the severity and duration of the defect or violation.  (Friedman et al., *supra,* §§ 3:46 to 3:47, pp. 3–14 to 3–15.)  In *Green, supra,* 10 Cal.3d at page 637, however, the court stated that "[i]n most cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligations under the common law implied warranty of habitability . . . ."  It follows that substantial noncompliance with applicable code standards could lead to a breach of the warranty of habitability.

15

Thus, if Sierra's failure to repair the premises constitutes a tort grounded on negligence, appellant is entitled to prove his damages for emotional distress because the failure to repair must be deemed to constitute an injury to his tenancy interest (right to habitable premises), which is a species of property. (*Id.* at p. 923.)

Moreover, we observe that Evidence Code section 669 "codifies the common law doctrine of negligence per se, pursuant to which statutes and regulations may be used to establish duties and standards of care in negligence actions." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927, fn. omitted.) "Statutes may be borrowed in the negligence context for one of two purposes: (1) to establish a duty of care, or (2) to establish a standard of care. [Citations.]" (*Id.* at p. 928, fn. 8; see *Toole v. Richardson–Merrell Inc.* (1967) 251 Cal.App.2d 689, 702–704, [rebuttable presumption of negligence arose from violation of Federal Food, Drug, and Cosmetic Act].)

Here, the complaint contains causes of action for breach of the warranty of habitability in various forms—1) "Violation of California Civil Code Section 1942.4"; 2) "Tortious Violation for Breach of the Warranty of Habitability"; 3) "Intentional Infliction of Emotional Distress"; 4) "Negligent Infliction of Extreme Emotional Distress"; 5) "Negligence: Violation of Duty to Maintain Habitable Conditions." Based on the foregoing, we cannot say as a matter of law that these causes of action are not viable.

As to appellant's remaining causes of action for constructive eviction, breach of the covenant of quiet enjoyment, and retaliatory eviction, we note that every lease includes a covenant of quiet possession and enjoyment. (Civ.Code, § 1927.) This covenant is breached upon actual or constructive eviction of the tenant. (*McAlester v. Landers* (1886) 70 Cal. 79, 82.) Any interference by the landlord that deprives the tenant of the beneficial enjoyment of the premises or renders the premises unfit for the purposes for which they are let amounts to a constructive eviction if the tenant so elects and vacates within a reasonable time. (*Kulawitz v. Pacific Woodenware Paper Co.* (1944) 25 Cal.2d 664, 670; *Pierce v. Nash* (1954) 126 Cal.App.2d 606, 612-613.)

16

As this court explained recently, " '[i]t has long been the rule that in the absence of language to the contrary, every lease contains an implied covenant of quiet enjoyment. [Citations.]  Initially, the covenant related solely to the right of possession and only protected the lessee against any act of molestation committed by the landlord or anyone claiming under him, or by someone with paramount title, which directly affected the tenant's use and possession of the leased premises; the covenant was construed to protect the lessee against physical interference only.  [Citation.]  In recent years, the covenant of quiet enjoyment has been expanded, and in this state, for example, it insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy.  [Citation.]'  [Citations.]" (*Nativi v. Deutsche Bank National Trust Company* (2014) 223 Cal.App.4th 261, 291-292 (*Nativi.*)

Further, "[i]t is not necessary to show that the landlord acted with the subjective intent to compel the tenant to leave the property or deprive the tenant of quiet enjoyment.  [Citation.]  There is a 'presumption that a landlord intends the natural and probable consequences of his acts; and where the acts of the landlord effectively deprive the tenant of the use and enjoyment of the premises, the intent to evict is implied from the character of the acts done.  [Citations.]'  [Citation.]" (*Nativi*, *supra*, 223 Cal.App.4th at p. 292.)

Simply put, " '[A]ny disturbance of the tenant's possession by the lessor or at his procurement . . . which has the effect of depriving the tenant of the beneficial enjoyment of the premises, amounts to a constructive eviction, provided the tenant vacates the premises within a reasonable time.  [Citations.]'  [Citations].  The Supreme Court stated in *Standard Live Stock Co. v. Pentz* (1928) 204 Cal. 618, 625 . . . that 'the covenant of quiet possession in a lease is not breached until there has been an actual or constructive eviction.'  Nevertheless, some authorities recognize that a tenant may sue for breach of the covenant while remaining in possession.  [Citations.]" (*Nativi*, *supra*, at p. 292.)

17

In addition, Civil Code section 1940.2 makes it unlawful for a landlord to commit certain specified acts "for the purpose of influencing a tenant to vacate a dwelling."[10] (Civ. Code, § 1940.2, subd. (a).) The purpose of Civil Code section 1940.2 is to prohibit a landlord's use of " 'constructive' self-help eviction" techniques (Friedman et al., Cal. Practice Guide: Landlord-Tenant, *supra*, ¶ 7:42, p. 7-14), such as theft, extortion, interference with a tenant's quiet enjoyment, or trespass "for the purpose of influencing a tenant to vacate a dwelling." (Civ. Code, § 1940.2, subd. (a).)

In sum, at this stage of the proceedings, we conclude that appellant's causes of action were adequately pleaded.[11]

Finally, in the event that on remand Sierra argues that the foreclosure sale extinguished appellant's initial lease with Schwann, in *Nativi*, *supra*, 223 Cal.App.4th 261, this court explained that in "May 2009, the United States Congress enacted the Protecting Tenants at Foreclosure Act of 2009 (PTFA or Act) (Pub.L. 111–22, Div. A, Title VII, §§ 702–704, May 20, 2009, 123 Stat. 1660) and, in 2010, the Congress amended it (Pub.L. 111–203, Title XIV, § 1484, July 21, 2010, 124 Stat. 2204). The Act provides protections for bona fide tenants of residential real property at foreclosure following the date of its enactment until its sunset at the end of 2014." (*Nativi*, supra, 223 Cal. App. 4th 268-269.)

---

[10] "It is unlawful for a landlord to do any of the following for the purpose of influencing a tenant to vacate a dwelling: [¶] (1) Engage in conduct that violates subdivision (a) of Section 484 of the Penal Code [theft]. [¶] (2) Engage in conduct that violates Section 518 of the Penal Code [extortion]. [¶] (3) Use, or threaten to use force, willful threats, or menacing conduct constituting a course of conduct that interferes with the tenant's quiet enjoyment of the premises in violation of Section 1927 that would create an apprehension of harm in a reasonable person . . . . [¶] (4) Commit a significant and intentional violation of Section 1954 [including abusing the right of access to harass the tenant (Civ. Code, § 1954, subd. (c)]." (Civ. Code, § 1940.2, subd. (a).)

[11] We express no opinion whatsoever as to whether this action can survive any further demurrer or any summary judgment motion that might be brought, as these matters are for the superior court to determine in the exercise of its sound discretion.

After "careful and extensive" examination of the PTFA, this court concluded "solely as a matter of statutory interpretation, that the PTFA causes a bona fide lease for a term to survive foreclosure through the end of the lease term subject to the limited authority of the immediate successor in interest to terminate the lease, *with proper notice*, upon sale to a purchaser who intends to occupy the unit as a primary residence. The Act impliedly overrides state laws that provide less protection but expressly allows states to retain the authority to enact greater protections. Bona fide tenancies for a term that continue by operation of the PTFA remain protected by California law." (*Nativi*, *supra*, at p. 270, italics added.)

Two final points: In *Nativi*, *supra*, at page 287, we concluded that permitting an immediate successor in interest in a foreclosed property to invoke the general rule that illegal contracts are unenforceable would allow it to circumvent the PTFA and frustrate its fundamental public policy purpose. Moreover, "[u]nder *Green v. Superior Court, supra*, a residential tenant may not be deemed to have exempted a landlord from the implied warranty of habitability by continuing to live in uninhabitable premises . . . ." (*Knight*, *supra*, 29 Cal.3d at p. 59.)

*Conclusion*

The trial court erred in sustaining Sierra's demurrer without leave to amend. Accordingly, we will remand this matter to the superior court for further proceedings.

19

*Disposition*

The order of dismissal is reversed and the matter is remanded to the superior court. The superior court is directed to vacate its order sustaining Sierra's demurrer without leave to amend and to enter a new and different order overruling the demurrer. Appellant is to recover his costs on appeal.

_____
ELIA, J.

WE CONCUR:


_____
RUSHING, P. J.


_____
PREMO, J.

20

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| Trial Judge: | Hon. Kay T. Kinsgley |
| Attorney for Appellant: | Raymond N. Stella Erlach |
| Attorneys for Amicus Curiae for Appellants: | Western Center on Law and Poverty<br>S. Lynn Martinez<br>Richard A. Rothschild<br>Madeline Howard |
| Attorneys for Respondent: | Soltman, Levitt, Flaherty & Wattles<br>Garth M. Drozin<br>Steven S. Nimoy |