Filed 3/9/21; certified for publication 4/6/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KELLEY PEVIANI et al., | |
| Plaintiffs and Appellants, | E073950 |
| v. | (Super.Ct.No. RIC1704192) |
| ARBORS AT CALIFORNIA OAKS PROPERTY OWNER, LLC. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Kira L. Klatchko, Judge.

Reversed.

The Weston Firm and Gregory S. Weston for Plaintiffs and Appellants.

Lester & Cantrell, Mark S. Lester, and Colin A. Northcutt for Defendants and

Respondents.

In a fifth amended class action complaint, Kelly Peviani, Judy Rudolph, and

Zachary Rudolph (collectively, plaintiffs), on behalf of themselves and others similarly

situated, sued Arbors at California Oaks Property Owner, LLC and JRK Residential

1

Group, Inc. (collectively, defendants). The lawsuit included eight causes of action: (1) false advertising (Bus. & Prof. Code, § 17500); (2) breach of the implied warranty of habitability; (3) nuisance; (4) breach of the implied covenant of good faith and fair dealing; (5) bad faith retention of security deposits; and (6) three causes of action for unfair competition (Bus. & Prof. Code, § 17200). Plaintiffs moved for certification of two classes. The trial court denied the motion. Plaintiffs contend the trial court erred by denying their class certification motion. We reverse.

**PROCEDURAL HISTORY**

A.     FIFTH AMENDED COMPLAINT

Defendants owned and operated an apartment complex in Murrieta known as The Arbors at California Oaks Luxury Apartments (the property). Kelly Peviani rented an apartment at the property from September 2016 to March 2017. Judy[1] and Zachary rented an apartment at the property from February 2014 to May 6, 2017.

Plaintiffs alleged the following facts: "Defendants advertise with colorful brochures and promising language that the Property is a safe, habitable, and luxurious place to live, with numerous amenities including a playground, cabanas and lounges, tennis and basketball courts, a rock climbing wall, gym, and pools and heated spas. [¶] But the Property is nothing of the kind. Instead, the Property is littered with used condoms, drug use, broken security gates, violence, is devoid of security patrols, and police are called to the complex on a regular basis. The pools are dirty, and the fitness

_____

[1] Two of the plaintiffs have the last name of Rudolph. We use their first names for the sake of clarity. No disrespect is intended.

2

equipment is broken. The complex is unsafe for tenants, especially children, and does not deliver on its material promises."

The first cause of action was for false advertising. (Bus. & Prof. Code, § 17500.) Plaintiffs alleged that defendants' brochure showed renovated interiors, "quality plush carpeting," "sparkling swimming pools," heated spas, cabanas and lounges, a tennis/basketball court, a fitness center, a rock climbing wall, a community game room, a Wi-Fi café, barbeque grills, a picnic area, a dog park, a playground, a garden, a carwash area, and central heating and air conditioning.

Plaintiffs alleged that defendants' website showed pictures of "glistening pools, and manicured gardens." The website discussed assigned covered parking and a 48-hour maintenance commitment. Defendants also advertised the property on other websites, such as apartments.com and forrent.com. On those websites, the advertisements for the property described granite countertops, hardwood floors, full size washers and dryers in the apartments, controlled access to the property, and a smoke-free property.

Plaintiffs alleged the foregoing advertisements were false. They alleged the apartments were not newly renovated and carpeting was not plush. For example, "[t]he Rudolphs had mushrooms growing out of their carpet." They alleged the fitness equipment was dirty and broken; the swimming pools were dirty and diseased; the hot tubs were green with algae; the assigned parking rules were not enforced; the 48-hour maintenance promise was not kept; there was violence, crime, and drug use in the area

3

of the barbecues, playground, and dog park; the property was not smoke-free; and the water connection in the carwash area was non-functioning.

The second cause of action was for breach of the implied warranty of habitability. Plaintiffs alleged the property lacked an adequate amount of trash receptacles, which caused trash to overflow, and the trash emitted a foul odor. In the common areas of the property, there were dog feces, used condoms, garbage, and rodents. The third cause of action was for nuisance. The fourth cause of action was for breach of the implied covenant of good faith and fair dealing. For the third and fourth causes of action, plaintiffs cited the same facts as those alleged in the second cause of action.

The fifth cause of action was for bad faith retention of security deposits. Kelly Peviani paid a security deposit of $1,175 when she moved into the property. When Peviani moved out of the property, she "thoroughly cleaned the apartment and left the apartment with no damage." Defendants retained $586.52 of Peviani's security deposit. Defendants deducted the following from the security deposit: $165.17 for "prorated paint"; $95 for housekeeping; $66.26 for industrial cleaning; $70 for carpet cleaning; $60 for reglazing the bathroom vanity; $111.51 for the February 2017 "UBill"[2]; and $18.58 for the final "UBill" that pertained to March 1 through March 5, 2017.

When the Rudolphs moved into the property in February 2014, they paid a security deposit of $225. When the Rudolphs moved out of the property in May 2017,

---

[2] We presume that a "UBill" refers to a utility bill.

defendants retained the entire security deposit and billed the Rudolphs an additional $178.69, for a total amount of $403.69.  The charges consisted of $116.99 for "prorated paint"; $60 for housekeeping; $66.26 for industrial cleaning; $60 for carpet cleaning; $79.30 for the April 2017 "UBill"; and $21.14 for the final "UBill" that pertained to May 1 through May 8, 2017.  After plaintiffs' counsel became involved, defendants canceled the $178.69 bill and returned the Rudolphs' security deposit to them.

Plaintiffs alleged that defendants had a pattern and practice of improperly retaining security deposits by charging for normal wear and tear, adding frivolous charges, charging for repairs that were never performed, charging for unrepaired damage caused by previous tenants, and charging for utility bills that were already paid.

The sixth cause of action was for unfair business practices.  (Bus. & Prof. Code, § 17200.)  Plaintiffs alleged defendants' conduct was unfair because (1) they falsely advertised the property, as described in the first cause of action; (2) the property was untenantable, as described in the second cause of action; and (3) when residents wanted to terminate their leases early, they must pay the current month's rent in full, two more months of rent in full, and a buyout fee in an amount greater than one month's rent— plaintiffs alleged the fees were an unlawful "liquidated damages clause" because the fees exceeded defendants' damages from an early-lease termination.

The seventh cause of action was for unlawful business practices.  (Bus. & Prof. Code, § 17200.)  Plaintiffs alleged defendants' conduct was unlawful because of the facts alleged in the first, second, and fifth causes of action.  The eighth cause of action concerned fraudulent business practices.  (Bus. & Prof. Code, § 17200.)  Plaintiffs

5

alleged defendants engaged in fraudulent business acts by utilizing false advertising as described in the first case of action.

Plaintiffs prayed for (1) an order requiring defendants to remedy the habitability problems; (2) an order enjoining defendants from engaging in deceptive business practices; (3) an order requiring defendants "to engage in a corrective advertising campaign"; (4) an order enjoining defendants "from withholding security deposits for ordinary wear and tear and without providing proper documentation"; (5) an order declaring leases are voidable for class members; (6) reformation of the leases; (7) an order enjoining defendants from engaging in unfair business practices; (8) an order requiring defendants to disgorge any unjust enrichment that resulted from their false advertising; (9) restitution in the amount of $15,000,000 for the false advertising and habitability issues; (10) damages of $10,000,000 for the withholding of security deposits; (11) pre and postjudgment interest; (12) punitive damages; (13) attorney's fees; and (14) costs.

B.    MOTION FOR CLASS CERTIFICATION

Plaintiffs moved for certification of two classes.  Plaintiffs asserted the property included 460 apartments.  The first class would concern the false advertising and habitability issues (the advertising and habitability class).  The people in that class would be all persons who paid rent at the property from March 15, 2013, to the present.

Plaintiffs asserted that common issues of law and fact predominated in the advertising and habitability class.  Plaintiffs contended "[t]he warranty of habitability claims here involve only the common areas of [the property]."  In regard to false

6

advertising, they asserted there was common evidence reflecting defendants made false claims on a website, in a brochure, and during tours of the property.

The second class would focus on the security deposit issues (the security deposit class). The people in that class would be "[a]ll former residents who paid security deposits at [the property] (excluding officers, directors, and employees of Defendants), and to whom Defendants did not return more than $125 of the security deposit within 21 days of the vacation of the apartment from March 15, 2013 to the present."

Plaintiffs contended that common issues of law and fact predominated in the security deposit class. Plaintiffs asserted, "There is common proof that Defendants have a policy of applying improper charges to security deposits regardless of cleanliness or damage. [Citations.] In addition, there is common proof that Defendants have a policy of failing to provide the required documentation to tenants within 21 days of move-out."

In addition to their own declarations, plaintiffs offered the declarations of tenants who had resided at the property. One of the declarations was by Gere Lubbock. Lubbock rented an apartment at the property beginning in September 2016. According to Lubbock, the pools were often closed for health reasons. There were dog feces in the common area, overflowing garbage bins with flies and maggots, and litter in the parking lots.

Another declaration was by Brian Westberg. Westberg rented an apartment at the property beginning in January 2015. Westberg saw dumpsters overflowing with garbage and feces in the common area. When he moved out, he left the apartment in a cleaner condition than it was in when he moved in. He was charged $221 for damages,

7

$100 for a late fee, $4 for a UBI fee, multiple amounts for utility bills that had already been paid, $5 for pest control, $10.08 for trash, and a $748 notice fee.

Plaintiffs provided the declaration of Antonio Cetta. Cetta began renting an apartment at the property in September 2016. The property's common areas had insects, dog feces, and used condoms. The dog park had rusty and broken infrastructure. The pools were often closed. The community garbage area overflowed with garbage and had a foul odor. The gym was dirty and the climbing wall was broken. Cetta cleaned the apartment himself before moving out. Cetta was told the apartment had to be professionally cleaned. Defendants deducted $743.85 from Cetta's security deposit. One of the charges included an electricity bill that Cetta had previously paid.

Another declaration was by Cerise Caicedo-Valdez. Caicedo-Valdez began renting an apartment at the property in August 2016. Caicedo-Valdez and her roommate paid a security deposit of $425. The dumpsters overflowed and smelled bad. There were condoms and feces in the common areas. The gym was dirty and smelled bad; there were vomit and feces in the gym restroom for days. Caicedo-Valdez meticulously cleaned her apartment prior to moving out. She was then told that the apartment would be professionally cleaned. Defendants kept her whole security deposit and charged her for additional undisclosed expenses.

Plaintiffs provided the declaration of Aubrey Mendez. Mendez began renting an apartment at the property in November 2016. Mendez and her roommate paid a security deposit of $425. The dumpsters at the property overflowed with garbage and smelled

8

bad. There were used condoms and feces in the common areas. Mendez left the apartment in the same or better condition than when she moved in. Defendants retained all of the $425 security deposit and billed Mendez $528. An itemized statement reflected Mendez was charged $95 for housekeeping, $79.52 for industrial cleaning, $394.98 for carpet replacement, $60 for vanity reglazing, and $156.91 for prorated paint.

Another declaration was by Emily McConville. McConville began renting an apartment at the property in December 2016. McConville saw a brochure that described the property as luxurious. McConville saw used condoms, drug paraphernalia, feces, and people using drugs in the common area of the property. An unhoused person slept near the dumpster area. Garbage overflowed from the dumpsters and skunks lived near the dumpsters and approached people who had garbage. McConville paid a security deposit of $625. Defendants retained all of the security deposit and charged McConville another $425. The charges included cleaning, vinyl replacement, and a pet odor charge despite McConville not having a pet.

Plaintiffs also provided their own declarations. Peviani declared that she began renting an apartment at the property in September 2016. Peviani's neighbors advised her not to use the pools because they were unsafe. The dumpsters overflowed with trash and had a foul odor. Peviani saw people digging through the garbage. The common areas were littered with dog feces and used condoms. When Peviani moved out, she left the apartment cleaner than when she moved in, with the exception of a small stain on the carpet. Defendants charged Peviani $95 for housekeeping, $66.26 for an industrial

9

cleaning, $70 for carpet cleaning, $165.17 for prorated paint, and $60 for reglazing the bathroom vanity.

In Judy's declaration, she declared that she looked at several websites to compare apartment complexes prior to selecting one. The Rudolphs moved into the property in January 2014. When the Rudolphs moved into their apartment, it had peeling paint, cracked outlets, and stains. There were drug deals taking place in the parking lot. The Rudolphs moved out of their apartment in May 2017. They cleaned the apartment before leaving. Defendants charged the Rudolphs $60 for housekeeping, $66.26 for industrial cleaning, $60 for carpet cleaning, and $116.99 for prorated painting.

C.    OPPOSITION

Defendants opposed the motion for class certification. Defendants asserted common questions did not predominate in regard to false advertising. Defendants contended plaintiffs failed to demonstrate what common experience supported class certification for the false advertising claim. In regard to a brochure that allegedly advertised newly renovated apartments, defendants contended "each tenant's experience is unique which necessitates a mini-trial for each to determine whether such conditions existed." For example, Peviani claimed her apartment had rust stains on the countertop, Judy claimed there was a mushroom growing out of her carpet, Lubbock asserted his toilet was broken, and Caicedo-Valdez claimed there was a stain on the bathroom vanity.

In regard to habitability, defendants faulted plaintiffs for failing to identify the common evidence that pertained to the habitability and nuisance causes of action. Additionally, defendants asserted there are no reported California cases certifying a class for a habitability or nuisance claim. Defendants asserted each class member would need to establish the existence of the defective conditions and the manner and extent to which the condition(s) impacted the individual class member.

Moving to the security deposit class, defendants asserted that the law required an individualized analysis of each resident's apartment in order to evaluate whether an unreasonable amount of the deposit was retained by defendants. Defendants asserted their records reflected that several of plaintiffs' declarants "left their units dirty with appreciable damage." As to paid utility bills being deducted from security deposits, defendants asserted that "whether or not a particular tenant was charged for utilities that were allegedly already paid requires an individualized inquiry into the tenant's file."

D.    REPLY

Plaintiffs replied to defendants' opposition. In regard to false advertising, plaintiffs asserted there were common evidentiary issues because the focus of the claim is defendants' conduct—not the residents' experiences. As to the habitability and nuisance issues, plaintiffs contended there are common evidentiary issues because the claims are focused on the common areas of the property. In regard to security deposits, plaintiffs argued that fraudulent charges and a lack of documentation were so widespread that a jury could find defendants acted in bad faith. Therefore, the security

11

deposit class could establish liability together, while their damages could be separately litigated.

E.    RULING

The trial court held a hearing on the motion on July 26, 2019.  The record does not include a reporter's transcript of the hearing, but the minutes reflect the court "inquire[d] of of [*sic*] all counsel re class similarities/subclasses," and counsel presented arguments.  On October 15, 2019, the trial court issued a nine-page ruling denying the motion for class certification as to all claims.

**DISCUSSION**

A.    LAW AND STANDARD OF REVIEW

In a class action, "[t]he party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

In regard to the factor of predominant common questions, the question that must be answered is "whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the

12

litigants.'  [Citations.]  The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.'  [Citation.]  A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible.  'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' "  (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022, fn. omitted.)

Orders denying class certification are reviewed differently by appellate courts than many other types of orders and judgments.  "Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct.  [Citation.]  But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness.  We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling.  [¶]  We will affirm an order denying class certification if any of the trial court's stated reasons was valid and sufficient to justify the order, and it is supported by substantial evidence.  [Citations.]  We will reverse an order denying class certification if the trial court used improper criteria or made erroneous legal

assumptions, even if substantial evidence supported the order." (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939 (*Knapp*).)[3]

    B.    THE ADVERTISING AND HABITABILITY CLASS

        1.    *FALSE ADVERTISING*

            a.    The Trial Court's Ruling

In regard to the false advertising claim, the trial court denied class certification due to a lack of commonality that would, in turn, cause the class to be unmanageable. The trial court explained that the putative class members learned of the property in different ways: some read defendants' website, some toured the property, some read a brochure, and some drove by the property. The trial court wrote, "One class member's a claim [*sic*] might be based upon an oral representation while another's might be based upon something stated in a brochure. And the representations could be about different amenities or services. The numerous possible factual differences in these potential claims evidences that there is no common question of fact. Moreover, the factual differences in the content of the various alleged misrepresentations, and the manner in which they may have been made, shows that there is no common question of law; the

---

[3] "The trial court [is] not required to state its reasons in the order denying the motion." (*Knapp, supra*, 195 Cal.App.4th at p. 939.) The trial court can express its reasons at the hearing on the motion or in a different document. (*Id.* at pp. 939-940.) In the instant case, the record does not include a reporter's transcript. The trial court wrote a nine-page, single-spaced, ruling denying class certification. In the ruling, the trial court described some of the discussions at the hearing on the motion. Neither party asserts that, at the hearing, the trial court gave more reasons or different reasons for denying the motion than were given in the written ruling. Accordingly, we will assume the nine-page written ruling is a complete reflection of the trial court's reasons for denying the motion.

factual difference in these alleged misrepresentations necessarily present different inquiries into whether a particular misrepresentation was one of fact, was material, was relied upon, and whether that reliance was reasonable."

> b.      Analysis

Plaintiffs contend the trial court erred in its commonality analysis concerning the false advertising claim because the trial court incorrectly treated reliance as a relevant factor.

The false advertising cause of action is based upon Business and Professions Code section 17500, which is known as the false advertising law (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 226). "[T]o state a claim under . . . the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' " (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951.) " 'Allegations of actual deception, reasonable reliance, and damage are unnecessary.' " (*People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054, 1076; see also *Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 332.)

"[T]he concept encompassed in the phrase 'likely to be deceived' has no relationship to the concept of common law fraud, which is also sometimes referred to as deception. A fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief under [Business and Professions Code] section[s] 17200 or 17500. A perfectly true statement couched in

such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections." (*Day v. AT&T Corp.*, *supra*, 63 Cal.App.4th at pp. 332-333.)

Restitution and injunctive relief are the only remedies available under the false advertising law. (Bus & Prof., § 17535; *Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1497.) Plaintiffs have sought restitution, in addition to injunctive relief, for the alleged false advertising. "While a party seeking injunctive relief need only prove that ' "members of the public are likely to be deceived" ' by the defendant's false advertisements [citation], a party seeking restitution must also prove that the defendant 'may have . . . acquired' 'money or property' 'by means of [its] unfair competition' or false advertising." (*Downey v. Public Storage* (2020) 44 Cal.App.5th 1103, 1114-1115.) That means plaintiffs seeking restitution "must prove that (1) the class members were exposed to the advertisement, (2) the advertisement was deceptive, and (3) the deception was material." (*Id.* at p. 1115.) Deception is material "if ' " 'a reasonable [person] would attach importance to' " ' that falsity or omission ' " 'in determining his [or her] choice of action in the transaction in question.' " ' [Citations.] And if a reasonable person would 'attach importance' to the falsity or omission, courts can safely and logically 'infer' or 'presume' that 'members of the public' (from which the putative class members are drawn) will rely on that falsity or omission in deciding whether to purchase the good or service." (*Id.* at p. 1116.)

In the trial court's ruling, it explained, "[T]he factual differences in these alleged misrepresentations necessarily present different inquiries into whether a particular

16

misrepresentation was one of fact, was material, was relied upon, and whether that reliance was reasonable." The trial court's reasoning indicates that it confused the false advertising cause of action (Bus. & Prof. Code, § 17500) with a fraud cause of action (see *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [reliance is an element of fraud]). In particular, the trial court's discussion of reliance and the potential need to have individualized inquiries into the issue of reliance demonstrates that the trial court was mistaken concerning the legal basis for the false advertising cause of action because individualized reliance is not a factor in a Business and Professions Code section 17500 cause of action.

Not only did the trial court rely on irrelevant factors, it failed to discuss the reasonable person standard, which is relevant to deception and materiality. Because the trial court used incorrect legal factors when analyzing the issue, we conclude the trial court erred. (See *Knapp*, *supra*, 195 Cal.App.4th at p. 939 [an order will be reversed if the trial court "used improper criteria or made erroneous legal assumptions"].)

## 2. *IMPLIED WARRANTY OF HABITABILITY AND NUISANCE*

### a. Habitability

#### i. *Procedural History*

Similar to the false advertising claim, the trial court found the habitability claim lacked commonality, which would cause the class to be unmanageable. The trial court wrote, "Plaintiffs allege the existence of multiple conditions that rendered the units uninhabitable or constituted a nuisance, but Plaintiffs have made no showing that these conditions were the same or even similar for every putative class member, or even a

17

majority of putative class members.  For example, some declarations supporting the motion allege that at times the pools were not usable, were closed, or were unsanitary.  Other declarants had no complaint about the pools.  Some declarants alleged that there were insufficient trash receptacles near their apartments, forcing them to use trash receptacles in other parts of the [property].  Others said that there was trash strewn about the [property] and that [the property's] management did not take action other than repeatedly emailing residents threatening 'fines for leaving trash lying around.' . . .  One declarant claimed . . . that the apartment was infested with fleas when she moved in.  Plaintiffs appear to argue that, taken together, these myriad defects rendered [the property] entirely uninhabitable, or subject to a nuisance condition . . . .  [I]t is not evident from the declarations supporting the motion that the putative class members, or named Plaintiffs, all experienced these conditions, or that the conditions occurred throughout a particular time period."

The trial court explained, "Because the basis for each putative class member's cause of action for breach of the warranty of habitability appears to be based upon a different defect, or defects, and because a finder of fact would be required to determine whether any such defects were substantial, each habitability claim would have to be litigated individually and there would be no common issue primary to each individual action.  Furthermore, the evidence supporting the motion suggests that each putative class member could be pursuing a different measure of damages, not merely a different amount of damages."

ii.     *Analysis*

Plaintiffs contend the trial court erred by finding a lack of commonality concerning their habitability claims.

"[A] warranty of habitability is implied by law in residential leases." (*Green v. Superior Court* (1974) 10 Cal.3d 616, 637.) The elements of a cause of action for breach of the implied warranty of habitability "are the existence of a material defective condition affecting the premises' habitability, notice to the landlord of the condition within a reasonable time after the tenant's discovery of the condition, the landlord was given a reasonable time to correct the deficiency, and resulting damages." (*Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1297.) The alleged defective condition must "affect the tenant's apartment or the common areas which he uses." (*Hinson v. Delis* (1972) 26 Cal.App.3d 62, 70, disapproved on another point in *Knight v. Hallsthammar* (1981) 29 Cal.3d 46, 55, fn. 7.) When the alleged defect is in a common area, the landlord's duty to inspect and maintain the common area removes any excuse by the landlord regarding a lack of knowledge. (*Muro v. Superior Court* (1986) 184 Cal.App.3d 1089, 1092, fn. 1.)

A violation of a statutory housing standard that affects health and safety is a strong indication of a materially defective condition. (See *Knight v. Hallsthammar*, *supra*, 29 Cal.3d at p. 59, fn. 10.) By statute, a dwelling will be considered untenantable if (1) the "[b]uilding, grounds, and appurtenances" are not "clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin" (Civ. Code, § 1941.1, subd. (a)(6)); or (2) the dwelling substantially lacks "[a]n

19

adequate number of appropriate receptacles for garbage and rubbish, in clean condition and good repair" (Civ. Code, § 1941.1, subd. (a)(7)).

Plaintiffs' warranty of habitability cause of action is solely focused on the common areas of the property. The trial court wrote in its ruling, "Plaintiffs allege the existence of multiple conditions that rendered *the units uninhabitable* or constituted a nuisance, but Plaintiffs have made no showing that these conditions were the same or even similar for every putative class member, or even a majority of putative class members." (Italics added.) The trial court appears to have jumbled the false advertising claims with the habitability claims. The habitability claims pertain to the common areas. The alleged defects in the individual units pertain to the false advertising allegations. Because the habitability cause of action is about the common areas—not individual units—the trial court's reasoning does not correspond to plaintiffs' allegations.

Further, substantial evidence does not support the trial court's conclusion. In nearly every declaration, the declarants cited a combination of dog feces, trash, and pests in the common areas. Whether the common areas were littered with filth and debris and infested with pests (Civ. Code, § 1941.1, subd. (a)(6)) and whether there were an adequate number of dumpsters in good condition (Civ. Code, § 1941.1, subd. (a)(7)) are common questions of fact because the condition of the dumpsters and the grounds is not an individualized issue—it is the same for everyone.

The Rudolphs lived in an apartment at the property from January 2014 to May 2017. In regard to filth and debris in the common areas, Zachary declared, "I frequently

20

encountered dog droppings. Over half the time I observed dog droppings on the sidewalk, and almost all the time there were dog droppings in the grass. I observed this throughout the complex." Zachary also declared "there were regularly dog droppings left near pool A. I often saw a family of skunks near pool A." Westberg, who moved into an apartment at the property in January 2015 and lived there for 13 months, declared, "[T]here was usually trash strewn all over the complex . . . . [¶] I regularly saw feces on the ground in common areas." Cetta, who lived at the property from September 2016 to July 30, 2017, declared, "Throughout my tenancy all of the common areas were extremely messy. There were issues with bugs and insects throughout. [¶] Dog poop was littered throughout the complex. You had to always pay attention to where you walked due to the dog poop was [*sic*] everywhere. On one occasion I even stepped in some." Zachary testified that "[t]he property as a whole, now, wasn't covered" in "debris or rubbish or filth," but that, approximately 50 percent of the time, he encountered dog feces on the pathways/sidewalks and on the grass at the property. The evidence indicates that, for years, there was consistently trash and feces in the common areas of the property.

In regard to the dumpsters, Zachary declared that when they moved in during 2014 "the dumpsters were emptied two or three times a week. However, later on [Zachary] observed that the dumpsters were emptied only once a week. [¶] Around the time the dumpsters stopped being emptied more than once a week, [Zachary] observed skunks around the dumpsters on an almost weekly basis." In a deposition, Zachary

testified that the garbage was overflowing approximately 80 percent of the time and emitted a strong foul odor "[m]ost of the time."

Judy testified, in a deposition, that the dumpsters were only usable for the day immediately following the trash trucks emptying the dumpsters. "Other than that, they were completely overflowing, and trash would be all around the ground." Judy said the garbage spilled out of the dumpster enclosure "into the street." Judy saw "skunks and different vermin" in the dumpster enclosures. Judy said there was one dumpster, the furthest from her apartment, that "wasn't always overflowing." Westberg, who moved in in 2015, declared, "Most of my time at [the property], the dumpsters were overflowing and smelled bad (even for dumpsters)." The other declarants, most of whom moved in in 2016, all complained of overflowing garbage.

In a declaration, Robert S. Griswold, who specializes in real estate management, declared that he visited the property and "reviewed a map of the property highlighting the location of garbage bins." Griswold declared that defendants claimed the property "has eleven 4-yard roll off trash bins which each can hold at least 48 standard trash bags or 800 pounds of refuse. Further, that [the property] also has eight 4-yard recycling bins which hold the same amount of recyclables. The bins are emptied three times a week on Mondays, Thursdays, and Saturdays. The number of bins and frequency of trash pickup is consistent with industry standards for an apartment complex the size of [the property]."

The evidence does not demonstrate that there are individualized issues concerning the habitability of the common areas. Instead, it shows that similar

22

questions will arise among each member of the putative class.  For example, was there a sufficient number of dumpsters, did the garbage overflow, were there pests, and was there dog feces on the ground.  Thus, the evidence does not support the trial court's conclusion that plaintiffs failed to show common issues.

In its ruling, the trial court concluded the habitability issues would be unmanageable as a class action.  However, the trial court's understanding of the cause of action was flawed when it made that conclusion.  The trial court believed the habitability cause of action pertained to problems in individual units, such as a flea infestation.  Because the trial court misconstrued the habitability cause of action, we cannot rely upon its exercise of discretion pertaining to manageability.

In regard to the element of damages, the trial court concluded there was a lack of commonality due to the different options for measuring damages.  The trial court believed that individual members of the putative class might seek different measures of damages.  The methods of measuring damages for a landlord's breach of the warranty of habitability include (1) the difference between the rent paid and the amount of rent that would have been reasonable given the defect; (2) "the difference between the fair rental value of the premises had they been in the condition warranted and their fair rental value with the uninhabitable condition [citation;] and ([3]) the rent paid by the tenant multiplied by the percentage of the premises rendered unusable due to the uninhabitable condition."  (*Erlach v. Sierra Asset Servicing, LLC*, *supra*, 226 Cal.App.4th at pp. 1279-1280.)

23

" 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022.) The differing methods of measuring damages does not defeat commonality in regard to issues of liability. If members of the putative class need to individually establish their damages, they may still establish liability as a class.

Next, the trial court expressed concern that the problems may have been intermittent, such that not every member of the putative class would have experienced these alleged problems. Arguably, that concern pertains to damages, which can be separated from liability. Nevertheless, to the extent the constant nature of the problem is relevant to liability, the evidence does not support the trial court's conclusion.

The Rudolphs lived in an apartment at the property from January 2014 to May 2017. Zachary complained of dog feces throughout the property and skunks near the pool. Westberg, who moved into the property in January 2015 and lived there for 13 months, complained of dog feces and trash in the common areas. Cetta, who lived at the property from September 2016 to July 30, 2017, complained of dog feces and insects in the common areas. The evidence indicates that, for years, there was consistently trash, feces, and pests in the common areas of the property. Therefore, the evidence does not support the conclusion that alleged problems with the common areas were intermittent.

Defendants contend there is a lack of commonality regarding habitability issues because each member of the putative class would need to prove that s/he was impacted

24

by the alleged defects. Civil Code section 1941.1 provides, "A dwelling shall be deemed untenantable" if it lacks sanitary common areas and adequate trash receptacles. (Civ. Code, § 1941.1, subd. (a)(6)&(7).) Landlords have a duty to maintain their buildings in a condition that make them fit for human habitation and to " 'repair all subsequent dilapidations thereof, which render it untenantable.' " (*Knight v. Hallsthammar*, *supra*, 29 Cal.3d at p. 53.) Evidence of the extent to which the allegedly untenantable building impacted each putative class member may be relevant to damages, but that evidence is not necessary for liability. (*Id*. at p. 54 [a landlord can breach the warranty of habitability despite a tenant being unaware of a defect].) Because damages can be tried separately, a lack of commonality regarding damages does not defeat class certification.

Next, at oral argument in this court, defendants contended there is a lack of commonality because the dumpsters did not become an issue until 2015 or 2016 and the class is defined as starting in 2013. "The 'predominant common questions' factor does not require that all class members have identical claims. Rather, the focus is on whether issues shared by the class members are sufficiently uniform to permit class-wide assessment, and whether individual variations in proof on those issues are manageable. [Citation.] [¶] 'The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." ' [Citation.] 'A class certification motion is not a license for a free-floating inquiry into the validity of the complaint's allegations; rather, resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citation], with the

25

court assuming for purposes of the certification motion that any claims have merit.' "
(*Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131, 1149.)

The habitability class is defined as " 'All persons (excluding officers, directors, and employees of Defendants) who paid rent at [the property] from March 15, 2013 to the present.' " The habitability cause of action asserts the common areas of the property were untenantable. The class is not focused solely on dumpster issues, it is focused on broader habitability problems that include trash, feces, and pests in the common areas of the property, and the dumpsters are a piece of that.

If the cases were tried on an individual basis, the same common question, i.e., were the common areas habitable, would lead to the same factual questions, e.g., were the common areas littered with trash and feces, were there pests, and did the dumpsters overflow? It may be that plaintiffs currently have weak evidence pertaining to the dumpster issue prior to 2016 but a possible evidentiary weakness in plaintiffs' case does not mean that the common issue is somehow altered or that the factual dispute would be presented differently if the cases were tried separately. In every case, the question will remain: what was the condition of the common areas of the property.

Next, defendants contend there are no reported cases in California in which a cause of action for breach of the warranty of habitability was prosecuted by a class. To the extent defendants are asserting such a class cannot be certified because no California appellate court has chosen to publish a case on the topic, we find that argument to be unpersuasive. A lack of published cases in the state does not create a prohibition. Nevertheless, if a published case is needed, one could look to federal cases. (*Techer v.*

26

*Roberts-Harris* (D.Conn. 1979) 83 F.R.D. 124, 131 ["The questions of law and fact whether a warranty of habitability pertains to HUD leases and whether HUD has breached that warranty are common to all tenants at OMG"]; *Thomas v. Louisiana-Pacific Corp.* (D.S.C. 2007) 246 F.R.D. 505, 507, 514, 517 [certifying a class for a lawsuit alleging breach of the warranty of habitability]; *McNeill v. New York City Housing Authority* (S.D.N.Y. 1989) 719 F.Supp. 233, 245, 251-253, 257 [certifying a class for a lawsuit alleging breach of the warranty of habitability].)

One federal case that is particularly relevant is *Johns v. Rozet* (D.D.C. 1992) 141 F.R.D. 211, 216, in which the court wrote, "The second requirement is also met, because there are questions of law or fact common to the class.  These include the factual determination of the living conditions existing in the common areas of Tyler House, and legal issues including whether there was a breach of warranty of habitability, negligence, public nuisance, and fraud in the existence of these conditions and failure to repair them."

   b. <u>Nuisance</u>

     i. *Procedural History*

In the fifth amended complaint, in the nuisance cause of action, plaintiffs alleged, "Throughout the Property, including the common areas, there exists a substantial accumulation of dog-droppings, debris, junk, rodents, garbage, and similar materials and conditions.  This is a substantial problem common throughout the entire Property. [Citation.]  [¶]  There are an inadequate number of community trash receptacles, which are regularly overflowing and emit a strong, noxious, and foul smell.  The failure to

27

provide such receptacles is substantial, and is hazardous and unsafe. This is a problem common throughout the entire Property." In nearly every declaration submitted by plaintiffs, the declarants cited a combination of dog feces and trash littering the common areas, rodents and pests in the common areas, as well as overflowing garbage at the community dumpsters.

In its ruling, the trial court wrote, "The habitability/nuisance/implied warranty/unfair competition causes of action . . . are limited to alleged nonspecific misrepresentations about the habitability of the property, i.e., representations about the physical condition of the individual units and about the physical condition of the common areas in relation to the impact on individual units or occupants." The court continued, "Plaintiffs allege the existence of multiple conditions that rendered the units uninhabitable or constituted a nuisance, but Plaintiffs have made no showing that these conditions were the same or even similar for every putative class member, or even a majority of putative class members. For example, . . . Others claimed that their neighbors were loud and argued frequently so as to require police intervention. One declarant claimed she left her apartment better than she found it, and that the apartment was infested with fleas when she moved in. Plaintiffs appear to argue that, taken together, these myriad defects rendered [the property] entirely uninhabitable, or subject to a nuisance condition."

The trial court concluded, "Based on the declarations offered in support of the motion for class certification, it is not clear that any one condition affected all residents, or former residents, of [the property] in the same way. It is also not clear that any one

28

condition was injurious to health, indecent, offensive, or obstructed the free use of any part of [the property] or any particular apartment for a specific period."

## ii. Analysis

Plaintiffs contend the trial court erred in finding a lack of commonality for the nuisance cause of action.

When reviewing an order denying class certification, we review the trial court's reasoning for correctness. "We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling." (*Knapp*, *supra*, 195 Cal.App.4th at p. 939.) In order to be affirmed, the trial court's ruling must have a rational basis. (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 764-765.)

In the fifth amended complaint, plaintiffs' nuisance allegations are focused on the common areas of the property. The declarations submitted by plaintiffs describe unsanitary common areas due to dog feces, trash, and pests.

In analyzing the commonality of the claims, the trial court included unit-specific claims, such as flea infestations, along with the common area allegations. Thus, the trial court misconstrued the nuisance cause of action. Because the trial court's commonality analysis includes allegations that were not part of the nuisance cause of action, the trial court's analysis is unreliable. (See *Dean Witter Reynolds, Inc. v. Superior Court*, *supra*, 211 Cal.App.3d at pp. 764-765 [trial court's ruling must have a rational basis].)

The evidence discussed *ante*, in relation to the habitability cause of action, is also relevant to the nuisance cause of action. In nearly every declaration, the declarants cited

29

a combination of dog feces, trash, and pests in the common areas. The evidence does not demonstrate that there are individualized issues concerning an alleged nuisance in the common areas. Instead, it shows that similar questions will arise among each member of the putative class. For example, was there an excessive amount of dog feces, trash, and pests in the common areas?

At oral argument in this court, without providing a citation and without providing a letter to the court explaining why the case was not discovered sooner (Cal. Rules of Court, rule 8.254), defendants urged this court to look at the "City of San Jose" case. We assume defendants were referring to *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, which is a nuisance case. In that case, real property owners "on behalf of themselves and all real property owners situated in the flight pattern of the San Jose Municipal Airport" sued the City of San Jose (the City). The plaintiffs sought "recovery for diminution in the market value of their property caused by aircraft noise, vapor, dust, and vibration . . . on theories of nuisance and inverse condemnation." (*Id.* at pp. 452-453.)

At the Supreme Court, the City contended the trial court erred in certifying the class because there was "an insufficient community of interest." (*City of San Jose v. Superior Court*, *supra*, 12 Cal.3d at p. 458.) The Supreme Court agreed that the trial court had erred. (*Ibid.*) The high court explained that the proposed class was diverse and included "industrial plants, public buildings, body shops, warehouses, gas stations, office buildings, multi-unit apartments, single family residences, and vacant land— some being farmed." (*Id.* at p. 461.) The high court explained, "While landing or

departure may be a fact common to all, liability can be established only after extensive examination of the circumstances surrounding each party. Development, use, topography, zoning, physical condition, and relative location are among the many important criteria to be considered. No one factor, not even noise level, will be determinative as to all parcels." (*Ibid*, fn. omitted.) The court continued, "Then, because liability is here predicated on variables like the degree of noise, vapor, and vibration, the problem is compounded by the factors of distance and direction affecting these variables." (*Id.* at p. 462.) The court concluded that the matter could not proceed as a class action due to a lack of commonality. (*Id.* at pp. 458, 462-463.)

The nuisance claim in the instant case concerns the condition of the common areas of the property. The property is a residential property. Thus, the instant case involves the same property (common area) that is used for the same residential purpose. That distinguishes this case from *City of San Jose*, in which the properties were in different locations and used for different purposes. Given the factual differences between the two cases, we do not find the commonality analysis of *City of San Jose* to be persuasive in the instant case.

### 6. *CONCLUSION*

In regard to false advertising, the trial court erred by relying on incorrect legal factors. (*Knapp*, *supra*, 195 Cal.App.4th at p. 939 [an order will be reversed if the trial court "used improper criteria or made erroneous legal assumptions"].) For habitability and nuisance, the trial court misconstrued the causes of action by not recognizing that

31

they are solely focused on the common areas. In sum, we conclude the trial court erred by denying certification of the advertising and habitability class.

### C. SECURITY DEPOSIT CLASS

A landlord may use a security deposit to pay for repairing "damages to the premises, exclusive of ordinary wear and tear, caused by the tenant or by a guest or licensee of the tenant." (Civ. Code, § 1950.5, subd. (a)(2).) A landlord may not use a tenant's security deposit to repair any conditions that preexisted the tenant's occupancy "or for the cumulative effects of ordinary wear and tear occurring during any one or more tenancies." (Civ. Code, § 1950.5, subd. (e).) A landlord's bad faith retention of the security deposit in violation of the foregoing law may subject the landlord "to statutory damages of up to twice the amount of the security, in addition to actual damages." (Civ. Code, § 1950.5, subd. (*l*).)

The elements of an action for wrongful retention of a security deposit under Civil Code section 1950.5 are: (1) the plaintiff paid a security deposit; (2) the security deposit was for a residential property; (3) the plaintiff used the property as a dwelling; and (4) the amounts deducted by the defendant were not reasonably necessary. If the plaintiff is seeking punitive damages, then it must also be shown that the defendant made the deductions in bad faith. (Civil Code, § 1950.5, subds. (a), (e) & (*l*).)

The only elements that are disputed in this case are (1) whether the deductions were reasonably necessary, which is defendants' burden to prove (Civ. Code, § 1950.5, subd. (*l*)), and (2) whether the deductions were made in bad faith such that the class would be entitled to punitive damages (Civ. Code, § 1950.5, subd. (*l*)). Damages,

32

including punitive damages, can be decided separately from liability, so individual issues pertaining to damages generally do not bar class certification. (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022 [discussing general damages]; *Lewis v. Robinson Ford Sales, Inc.* (2007) 156 Cal.App.4th 359, 371 [discussing punitive damages].) Thus, the primary question for the security deposit class, in regard to commonality for class certification, is whether common evidence predominates concerning the reasonableness of defendants' deductions.

There is an interesting twist regarding this issue. In the motion for class certification, plaintiffs bear the burden of proving commonality. However, at trial, it is defendants who bear the burden of proving the reasonableness of their security deposit deductions. Thus, plaintiffs were in a predicament in regard to the certification motion, in that they had to establish that there would be common evidence on an element for which they did not bear a burden of proof.

In its ruling, the trial court denied class certification for the security deposit class because it determined individualized evidence would predominate, which meant there was a lack of commonality and the class would be unmanageable. The trial court wrote, "In the absence of a uniform bad-faith policy of security deposit retention, the Court cannot preclude Defendants from raising offset claims particular to each deposit deduction, and these deposit-deduction inquiries would be highly individualized."

The trial court's reasoning missed the mark in two respects when analyzing commonality. The trial court wrote that plaintiffs' evidence did "not reflect a pattern that even remotely suggests Defendants had a bad faith policy of retaining security

33

deposits throughout the relevant time period." The first problem is that the trial court focused on bad faith/punitive damages, rather than the reasonableness of the deductions, which concerns liability. Damages can be dealt with apart from liability and "generally do not defeat certification." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 30.) The trial court should have focused on liability, rather than damages. (*Brinker*, *supra*, 53 Cal.4th at p. 1021 [commonality hinges on plaintiff's theory of liability].)

The second problem is that the trial court discussed plaintiffs' evidence as though plaintiffs had to prove a likelihood of prevailing on their theory. The focus, at the class certification stage, should be on plaintiffs' theory of liability—not on their likelihood of prevailing. (*Brinker*, *supra*, 53 Cal.4th at p. 1021 [commonality hinges on plaintiff's theory of liability].) Merit-based challenges are not part of the certification process because substantial discovery could be "required if plaintiffs [were] expected to make meaningful presentations on the merits," which would "render the certification process more protracted and cumbersome." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 440-441.) Accordingly, it is not reasonable to deny class certification based on perceived weaknesses in plaintiffs' evidence concerning punitive damages.

Another reason given by the trial court for denying class certification was that defendants could "litigate the amounts deducted from the security deposit of each vacating tenant on an individual basis." In support of their opposition to the class certification motion, defendants sought to show the reasonableness of their deductions via the declaration of Brandie Ellis, who manages the property. Ellis processes the paperwork for move-ins and move-outs. When a tenant moves out, Ellis or another staff

member inspects the unit for cleanliness, wear and tear, and damage. Ellis "review[s] the results from the inspection . . . and determine[s] what, if any, charges should be assessed to the vacating tenant."

Ellis reviewed the declarations submitted by plaintiffs and then reviewed defendants' files pertaining to the declarants. Ellis found the following: (1) defendants have no record of Caicedo-Valdez residing at the property, so defendants would not have refunded a security deposit to her; (2) Lubbock did not document preexisting damage. When Lubbock moved-out "the unit was dirty with appreciable damage, including debris throughout the unit, a broken microwave handle, damage to the walls and deep stains in the carpet"; (3) Mendez's apartment had a hole in the carpeting that required repair upon her vacating the unit; (4) When McConville vacated, the unit had "several deep carpet stains (including bright red stains), a broken window blind, and badly stained vinyl flooring in the bathroom"; (5) When Cetta vacated, the unit was "very dirty" including "a tire on the patio." Ellis cited to photographs of the different units to support her assertions regarding the condition of the units.

Also in support of their opposition, defendants provided the declaration of Robert S. Griswold, who has more than 35 years of experience in real estate management. Griswold reviewed the motion for class certification, including all the evidence in support of the motion, plaintiffs' written discovery responses, a sample of itemized statements for security deposit deductions, and defendants' evidence. Griswold also toured the property. Griswold declared, "[B]ased on my experience, the deductions made did not appear unreasonable." Griswold went on to explain why plaintiffs'

35

expert's opinion, concerning the unreasonableness of defendants' deductions, was incorrect.

The foregoing evidence reflects defendants have options for proving the reasonableness of their deductions. (Civ. Code, § 1950.5, subd. (*l*) [defendants bear the burden of proof].) They could present Ellis's testimony regarding each moveout and/or they could present Griswold's testimony about the reasonableness of their deductions. It is unclear if defendants plan to present the reasonableness of their deductions: (1) primarily via Ellis testifying about individual moveouts; (2) primarily through the opinions of experts who review the records outside of court; or (3) an equal mixture of both.

In plaintiffs' attorney's declaration, he declared, " 'From the period beginning in March of 2013 thru June of 2017 there were 1,413 lease agreements for the apartment units, which may include leases in which a tenant moved from one apartment to another in the complex.' " It is unclear how many of the 1,413 lease agreements were renewals, how many were transfers to a different roommate, or how many were complete moveouts. If one were to assume that an arbitrary number such as 50 percent, i.e. 700, were complete moveouts and all 700 had paid a security deposit, and it were further assumed that defendants' trial plan is to have Ellis testify about all 700 moveouts, then two questions come to mind regarding manageability. The first question is whether the trial court would allow all of that testimony to occur or, if at some point, the testimony would become cumulative. (Evid. Code, § 352.) For example, if Ellis testified regarding 100 moveouts, and only two of them showed unreasonable deductions, would

36

the trial court allow the testimony to proceed or would the issue of reasonableness have been proven on that point?

The second question concerning manageability is whether the trial court would allow testimony about all the deductions or only the allegedly unreasonable deductions. In the trial court's ruling it set forth a list of 24 questions that would need to be asked about every moveout, such as "(6) whether repairs were necessary; (7) whether amounts charged for particular repairs were necessary; (8) the age and expected useful life of certain items, including carpet, paint, carpet pad, and appliances in each apartment." Presumably, by the time of trial, the allegedly unreasonable deduction(s) for each moveout will have been identified such that defendants will not have to present evidence for every deduction for every moveout. For example, McConville declared that defendants took a pet odor deduction from her security deposit despite her not having a pet. For McConville's moveout, it may not be necessary to present evidence of repairs and carpet pads; it would only be necessary to present evidence of pets and pet odor.

In the trial court's ruling, the court fails to consider that it can control the presentation of evidence (*McDaniel v. Superior Court* (1976) 55 Cal.App.3d 803, 805), and if there is a point where the evidence is cumulative on the issue of reasonableness, then the trial court can halt the introduction of further evidence on that topic. (Evid. Code, § 352.) We fail to see why, in order to prove the reasonableness of their deductions, defendants would need to go through every deduction for every moveout. A detailed analysis such as that might be necessary for some claims of damages, but it

would not be necessary for reasonableness. Reasonableness involves the decision-making process, the criteria, and the consistency of the decision-maker, who in this case appears to be Ellis. If the criteria are reasonable and the criteria are consistently applied, then reasonableness is properly proven by common evidence. In sum, we conclude the trial court erred by concluding there is a lack of commonality. Additionally, because the trial court's commonality finding was flawed, its related conclusion pertaining to manageability is unreliable.

D.      BUSINESS AND PROFESSIONS CODE SECTION 17200

1.      *PROCEDURAL HISTORY*

Plaintiffs brought three causes of action alleging unlawful, unfair, or fraudulent business practices. (Bus. & Prof. Code, § 17200.) All three causes of action were brought on behalf of the advertising and habitability class.

In the sixth cause of action, plaintiffs alleged unfair business practices (Bus. & Prof. Code, § 17200) due to (a) the alleged false advertising, (b) the common areas being untenantable, and (c) the leases having an unlawful liquidated damages clause for early moveouts.

In the seventh cause of action, plaintiffs alleged unlawful business practices (Bus. & Prof. Code, § 17200) due to (a) the alleged false advertising; (b) the common areas being untenantable; and (c) defendants allegedly violating Civil Code section 1950.5 by (i) making improper deductions from security deposits, and (ii) failing to provide statements and documentation for security deposit deductions. In the eighth

cause of action, plaintiffs alleged fraudulent business practices (Bus. & Prof. Code, § 17200) due to false advertising.

The trial court's ruling addressed the Business and Professions Code section 17200 causes of action only briefly. In the portion of the ruling concerning the advertising and habitability class, the trial court wrote, "Plaintiffs' assertion relating to the habitability/nuisance/breach of implied [covenant] of good faith and fair dealing/unfair competition causes of action is similarly unsupported by Plaintiffs' own evidence. It is not entirely clear from Plaintiffs' evidence or argument how the alleged misrepresentations, or alleged policy of misrepresentation, is linked to habitability/nuisance/breach of implied [covenant] of good faith and fair dealing/unfair competition but it appears that Plaintiffs contend the unspecified misrepresentations were that [the property] was a luxury complex when in fact it was uninhabitable or that numerous nuisances on the property impacted the ability of putative class members to use and enjoy their apartments."

### 2. *ANALYSIS*

"[W]hen denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling." (*Knapp*, *supra*, 195 Cal.App.4th at p. 939.)

The trial court did not provide additional reasons for denying class certification as it pertained to the three Business and Professions Code section 17200 causes of action. (See generally *Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 918 ["we

39

examine each alleged caused of action to determine whether it is appropriate for class treatment"].)  We have concluded *ante* that the trial court erred in its reasons for denying class certification.  Because the trial court's reasons for denying class certification related to Business and Professions Code section 17200 causes of action are the same as for the other causes of action, we conclude the trial court erred in relation to these three causes of action as well.

### E.     REMAINING ISSUES

In the appellants' opening brief, plaintiffs raise a variety of issues, such as the class being sufficiently numerous and the class being ascertainable.  When reviewing an order pertaining to class certification, we review only the reasons given by the trial court.  We do not address any unexpressed reasons.  (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 980.)

In our discussion *ante*, we reviewed the trial court's reasons for denying class certification.  The trial court did not address issues such as whether the putative class was sufficiently numerous and ascertainable.  Because the trial court did not express an opinion as to those issues, we cannot express an opinion as to those issues.  Therefore, we do not address the issues raised by plaintiffs that are outside the scope of the trial court's expressed reasons.

## DISPOSITION

The order is reversed.  Appellants are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


MILLER _____
Acting P. J.


We concur:


CODRINGTON _____
J.


RAPHAEL _____
J.

Filed 4/6/21

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

<u>**ORDER**</u>

KELLEY PEVIANI et al.,
    Plaintiffs and Appellants,

    v.

ARBORS AT CALIFORNIA OAKS
PROPERTY OWNER, LLC, et al.,
    Defendants and Respondents.

_____

E073950

(Super.Ct.No. RIC1704192)

The County of Riverside

THE COURT

    The requests for publication of the nonpublished opinion filed in the above matter March 26 and March 29, 2021, are GRANTED. The opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c)(2), (3), and (6).

    IT IS SO ORDERED that said opinion filed March 9, 2021, be certified for publication pursuant to California Rules of Court, rule 8.1105(b).

    CERTIFIED FOR PUBLICATION

<u>MILLER</u>                
                      Acting P. J.

I concur:

<u>RAPHAEL</u>            
            J.